UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| KARSE and ARLENE SIMON, Individually and On Behalf of All Others Similarly Situated, <br><br> Plaintiffs, <br><br> v. <br><br> ABIOMED, INC., MICHAEL R. MINOGUE and ROBERT L. BOWEN, <br><br> Defendants. | No. 1:12-cv-12137-FDS <br><br> <u>JURY TRIAL DEMANDED</u> |

**<u>AMENDED CLASS ACTION COMPLAINT</u>**

## TABLE OF CONTENTS

I.      NATURE OF THE ACTION ...............................................................................2

II.     JURISDICTION AND VENUE .........................................................................7

III.    PARTIES .............................................................................................................8

        A.    LEAD PLAINTIFFS.................................................................................8

        B.    DEFENDANTS ........................................................................................9

IV.     LEAD PLAINTIFFS' INVESTIGATION .........................................................10

V.      SUBSTANTIVE ALLEGATIONS ...................................................................12

        A.    COMPANY AND DEVICE BACKGROUND.......................................12

        B.    FDA REGULATORY OVERVIEW .......................................................14

        C.    IMPELLA 2.5 LIMITED FDA CLEARANCE.......................................19

        D.    THE PROTECT II STUDY ....................................................................20

        E.    THE RECOVER II STUDY ...................................................................22

        F.    DEFENDANTS ENGAGED IN WIDESPREAD OFF-LABEL
              MARKETING OF THE IMPELLA 2.5 AND IGNORED AND
              MISREPRESENTED CITATIONS FROM THE FDA REGARDING
              SUCH PRACTICES ...............................................................................22

              1.    Pre-Class Period Citations From The FDA ..................................22

              2.    The June 2011 Warning Letter ....................................................25

              3.    Defendants Continued To Engage In Widespread Off-Label
                    Marketing.....................................................................................28

                    a.    Defendants' Public Promotional Materials Improperly
                          Marketed The Impella 2.5 For Off-Label Uses......................28

                    b.    Defendants Utilized Marketing Materials With Customers
                          That Promoted Off-Label Uses And Trained Sales and Clinical
                          Staff To Off-Label Marker During The Class Period ............32

4. The FDA's Continued Scrutiny And Admonishment of Abiomed ..................................................................37

G. DEFENDANTS' FALSE AND MISLEADING STATEMENTS ............41

1. August 2011 Statements ................................................41

2. November 2011 Statements ...........................................47

3. February 2012 Statements..............................................52

4. May/June 2012 Statements ............................................57

5. August 2012 Statements ................................................62

6. September 2012 Statements ...........................................65

7. Certifications and Internal Controls...............................66

H. THE TRUTH IS REVEALED...................................................68

I. LOSS CAUSATION...............................................................72

J. ADDITIONAL SCIENTER ALLEGATIONS.........................................74

1. The Insider Trading Supports A Strong Inference Of Scienter .....75

2. The Misconduct Related To Abiomed's Core Business Which Further Evidences Defendants' Scienter........................................79

3. The Pervasiveness Of The Misconduct Further Supports A Strong Inference Of Scienter .......................................80

VI. CLASS ALLEGATIONS ....................................................................81

VII. APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD-ON-THE-MARKET DOCTRINE .........................................................83

VIII. NO SAFE HARBOR ........................................................................84

IX. CLAIMS FOR RELIEF ....................................................................85

X. PRAYER FOR RELIEF ....................................................................88

XI. JURY TRIAL DEMANDED ...............................................................88

Court-Appointed Lead Plaintiffs, the City of Austin Police Retirement System and the Fire and Police Pension Association of Colorado  (the "Lead Plaintiffs"), bring this federal securities class action against Abiomed, Inc. ("Abiomed" or the "Company"), its Chief Executive Officer ("CEO"), Michael R. Minogue ("Minogue"), and its Chief Financial Officer ("CFO"), Robert L. Bowen ("Bowen") (collectively, "Defendants"), on behalf of themselves and all other persons or entities (other than Defendants and any of their affiliates, as described herein) who purchased, or otherwise acquired from such a purchaser, Abiomed's publicly-traded common stock and/or call options, or sold Abiomed put options on the open market from the period beginning on August 4, 2011 through and including October 31, 2012 (the "Class Period") and who were damaged by the conduct alleged herein.

Lead Plaintiffs allege the following upon personal knowledge as to the allegations specifically pertaining to Lead Plaintiffs and upon information and belief as to all other matters.  Lead Plaintiffs' information and belief as to allegations concerning matters other than themselves and their own acts is based upon an investigation by their counsel which included, *inter alia*, a review of: Abiomed's public filings with the United States Securities and Exchange Commission ("SEC"); press releases and other public statements issued by Defendants; analyst, media and news reports about the Company; publicly available trading data for Abiomed's securities; Abiomed's marketing and training materials used during the Class Period; communications between Abiomed and the U.S. Food and Drug Administration ("FDA")  and discussions with former employees of the Company.

## I.     NATURE OF THE ACTION

1.      This action arises from a scheme by Defendants whereby they

misrepresented and concealed, *inter alia*, that Abiomed improperly marketed and

promoted the Company's primary revenue driver, the Impella Recover LP 2.5 device

("Impella 2.5"), a micro heart pump used for blood flow, by far the Company's most

important and profitable device, for uses that were not cleared by the FDA.  Defendants

mislead Abiomed's investors by making false and misleading statements in regard to

Abiomed's off-label marketing of the Impella 2.5, misstating and concealing the FDA's

continued warnings to Abiomed regarding this improper activity, and falsely stating

Abiomed's cooperation and compliance with FDA regulations when Defendants knew

Abiomed continued to aggressively promote the Impella 2.5 improperly.  These false and

misleading statements artificially inflated Abiomed's stock price.  When the truth was

finally revealed to the market at the end of the Class Period, Abiomed's stock price

plummeted almost 32% in one day, causing Lead Plaintiffs and the Class to suffer

substantial losses.

2.      During the Class Period, the vast majority of Abiomed's revenue was

derived from sales of the Impella 2.5, according to Abiomed's quarterly filings with the

SEC during the Class Period.  In essence, the Impella 2.5 was the Company.

3.      In 2008, Abiomed received "510(k)" clearance from the FDA to market

and commercially distribute the Impella 2.5.  This is a very limited clearance for partial

circulatory support for under six hours.  Marketing and promotion of the Impella 2.5 is

very highly regulated by the FDA.  The FDA prohibits, *inter alia*, marketing the device

for uses for which it has not been cleared and for improperly comparing the device to

competitor devices.  Abiomed is also strictly prohibited from making false and misleading statements in the marketing of the device.

4.      Abiomed, however, has been desperate to break into the market of its main competition, the intra-aortic balloon pump ("IABP"), a mechanical device that increases blood flow, which has been sold since the 1960s, is extremely popular with physicians, and costs a fraction of what the Impella 2.5 costs.

5.      In an effort to market the device as superior to the IABP, Abiomed sponsored two studies comparing the Impella 2.5 to the IABP, the Protect II study and the Recovery II study.  Abiomed hoped that these studies would show that the Impella 2.5 performed better than the IABP and, in the long run, would be less costly than IABPs. The hope was that any positive results from these studies would encourage physicians to use the Impella 2.5 more often and also be used in efforts to support an application for FDA clearance for the studied uses.  Both studies, however, were terminated early (Protect II for futility and Recover II for insufficient enrollment) and neither obtained the results that Abiomed had sought.

6.      Despite the failed studies, which were terminated before the Class Period, Abiomed continuously marketed the Impella 2.5 during the Class Period as superior to the IABP in its marketing materials and in the field, *i.e.*, during sales and clinical representatives' visits with doctors, hospitals and medical groups.  Likewise, during the Class Period, Abiomed also improperly marketed the product for uses which were not FDA cleared for the device and made claims in its marketing and promotional materials that the Impella 2.5 was safe and effective for non-cleared uses in direct violation of applicable laws and regulations.

3

7.      Before the Class Period, and as far back as January 2010, the FDA repeatedly warned Abiomed about its improper marketing and promotional practices, specifically in regard to the improper comparison of the Impella 2.5 with the IABP and promotion of the device for non-cleared uses in advertisements.  Despite these citations by the FDA for such violations Abiomed continued such practices and, on June 10, 2011, the FDA sent a formal warning letter, addressed to Defendant Minogue, citing Abiomed's continued improper promotion and marketing of the Impella 2.5, including improperly comparing the Impella 2.5 with the IABP and promotion of the device for non-cleared uses in advertisements and industry presentations.

8.      Yet, Defendants trivialized these issues in their public statements and repeatedly stated that the issues with the FDA were resolved and that Abiomed was no longer utilizing the types of marketing cited by the FDA.  In truth, however, the matter was not resolved and Abiomed continued its pervasive practice of improperly marketing and promoting the Impella 2.5, including in the specific ways cited in the FDA letters.

9.      Indeed, Defendants continued to engage in widespread improper promotion and marketing of the Impella 2.5 in their public promotional statements, marketing materials and in the field through its sales and clinical representatives, in flagrant disregard for the law, the FDA's citations and their own assertions that Abiomed was not engaging in such practices.  These violations included comparing the Impella 2.5 to the IABP and promoting the device for uses for which it does not have clearance in advertisements and industry presentations similar to those detailed in the FDA's letter, in an interview of Defendant Minogue which aired on CNBC, and in Abiomed's SEC filings, which were signed and certified by Defendants Minogue and Bowen.

Defendants also violated FDA regulations by directing Abiomed's sales and clinical staff to use marketing materials with customers, including doctors and hospital administrators, which promoted non-cleared uses of Impella 2.5 and improperly compared the Impella 2.5 with the IABP. Moreover, Defendants trained sales and clinical representatives on marketing the device for non-cleared uses, including how to prompt and steer physicians to ask about non-cleared uses of the Impella 2.5.

10.    These improper marketing practices included a pervasive marketing campaign regarding the failed Protect II study. Abiomed consistently touted the "results" of the Protect II study based on data it cherry-picked and engaged in its own post-hoc analysis of after the study failed and was no longer supported by the FDA. This marketing went far beyond the disclosure of the data from the failed study and instead improperly focused on claims of purportedly "demonstrated superiority" of the Impella 2.5 over the IABP.

11.    Although the FDA repeatedly warned Abiomed that its claims, comparisons and marketing were improper, including the marketing of the device as safe and effective for non-cleared uses, Abiomed ignored the warnings. While Abiomed told investors and the FDA that it was not engaging in such practices, it continued to do so. In fact, after the FDA discovered that Abiomed continued to engage in the exact type of improper marketing for which the FDA had repeatedly cited Abiomed, and which Abiomed had agreed to discontinue, the FDA again contacted Abiomed. This lead to a meeting on February 24, 2012 between Abiomed and the FDA that was attended by Defendant Minogue, and at which they discussed Abiomed's improper marketing of the Impella 2.5, including in regard to claims regarding the Protect II study and non-cleared

uses, and the FDA's safety concerns with the devise related to the Protect II study. Thereafter, the FDA sent yet *another* letter to Abiomed in April 2012 regarding Abiomed's continued marketing of the Impella 2.5 in violation of FDA regulations.

12.     In the face of this, Defendants failed to disclose the extent of the FDA involvement or its concerns and continually misled investors by making false and misleading statements that the Company had resolved the matters raised by the FDA and that it was following its own policy of refraining from off-label marketing and promotion of its products.

13.     Further, during the Class Period, Abiomed reported increased revenues for Impella products for every single quarter.  What Abiomed failed to inform investors, was that much of the revenue it earned during the Class Period was due to illicit marketing, and that such revenue was thus in jeopardy should Abiomed be forced to cease its improper off-label marketing.[1]

14.     However, Defendants could not continue their illicit scheme and ignore the FDA's warnings forever.  Although not disclosed by Abiomed until the end of the Class Period, during the summer of 2012, the FDA audited the Company's marketing materials and practices and Abiomed simultaneously conducted its own internal audit. As a result, Abiomed was forced to take drastic corrective action.  Abiomed pulled *all* of its marketing materials from the field and the Company's website and re-certified its sales and clinical representatives and management to comply with governing regulations. Moreover, when new marketing materials were finally made available to sales and

---

[1] "Off-label" and "off-label marketing" as used herein refers to marketing, labeling and promoting the device for uses for which it does not have FDA clearance and improperly comparing it to other devices in violation of applicable laws and regulations, such as prohibitions on misbranding and adulterating a device as discussed herein.

clinical representatives several months later, the materials were vastly limited compared to what they were given previously, including that they no longer included presentations for customers on the marketing pitch regarding the failed Protect II study.

15.     Defendants' charade finally came to an end on November 1, 2012 when the Company announced that the United States Attorney's Office for the District of Columbia (the "D.C. U.S. Attorney's Office") had formally begun an investigation into the Company's marketing and labeling of the Impella 2.5 (as of the date of this complaint, this investigation is ongoing).  Abiomed also announced that it was keeping Impella revenue guidance for the year at 30% despite 45% growth in the first half of the year, revealing a marked slowdown into the end of the year due to changes in the Company's marketing practices.

16.     Further, during Abiomed's November 1, 2012  earnings call, Defendant Minogue admitted that:

> In the recent months, Abiomed, in coordination with the FDA, has taken extensive actions to correct our noted compliance issues identified in our annual report.  Abiomed has conducted an internal compliance audit of marketing materials and recertified the field team and management on our Impella labels.

17.     In response, Abiomed's stock price plummeted from a closing price of $19.82 on October 31, 2012 to $13.61 on November 1, 2012, erasing $6.21 per share, or 31%, of the value of Abiomed's common stock.

## II.     JURISDICTION AND VENUE

18.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b-5, 17 C.F.R. § 240.10b-5 promulgated thereunder.

19.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331 and 1337.

20.     Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Many of the acts and transactions giving rise to the violations of law complained of herein, including the preparation and dissemination to the investing public of materially false and misleading financial and other statements, occurred in this District.  In addition, Abiomed maintains its principal executive office at 22 Cherry Hill Drive in Danvers, Massachusetts.

21.     In connection with the acts, conduct and other wrongs complained of herein, all Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mails, and the facilities of a national securities market.

### III.     PARTIES

#### A.     LEAD PLAINTIFFS

22.     Lead Plaintiff City of Austin Police Retirement System ("APRS") was established in 1980 by a City Council ordinance.  Effective August 1991, APRS is governed by state law with plan amendments made by the Legislature of the State of Texas.  APRS provides retirement, death, disability and withdrawal benefits to plan members and their beneficiaries.  As of December 31, 2011, APRS had 2,295 participating members, most of whom are full-time police officers and cadets employed by the police department of the City of Austin.  The value of the APRS' assets exceeds $552 million as of March 31, 2013, and those assets are invested in a diversified portfolio consisting of real estate, domestic stocks, fixed bonds, and other investments.  During the

Class Period, APRS purchased shares of Abiomed's stock as set forth in the certification submitted with its lead plaintiff application (Dkt. No. 13-1) in this case, incorporated by reference here, and suffered damage on those trades as a direct and consequent result of the fraudulent conduct alleged herein.  On February 14, 2013, this Court appointed APRS Lead Plaintiff for the Class (defined below) pursuant to Section 21D(a)(3)(B) of the Exchange Act.

23.     Lead Plaintiff Fire and Police Pension Association of Colorado ("FPPA") was established in 1980 pursuant to the Colorado Revised Statutes of 1973, as amended. FPPA administers two funds: the Fire & Police Members' Benefit Investment Fund and the Fire & Police Members' Self-Directed Investment Fund.  As of December 31, 2011, FPPA has 15,860 participating members, most of whom are active or retired police officers and firefighters.  As of December 31, 2012, FPPA's investment assets totaled $3.39 billion, which were invested in a diversified portfolio.  During the Class Period, FPPA purchased shares of Abiomed's stock as set forth in the certification submitted with its lead plaintiff application (Dkt. No. 13-1) in this case, incorporated by reference here, and suffered damage on those trades as a direct and consequent result of the fraudulent conduct alleged herein.  On February 14, 2013, this Court appointed FPPA Lead Plaintiff for the Class (defined below) pursuant to Section 21D(a)(3)(B) of the Exchange Act.

**B.     DEFENDANTS**

24.     Defendant Abiomed is a public company that is incorporated in the state of Delaware and maintains its principal place of business at 22 Cherry Hill Drive in Danvers, Massachusetts.  Abiomed develops, manufactures, markets and sells medical

devices designed for circulatory support.  Its primary revenue driver is the Impella 2.5.

Abiomed common stock is traded on the NASDAQ under the symbol "ABMD."

     25.     Defendant Michael R. Minogue was, at all relevant times, Abiomed's

President, Chairman of the Board and CEO.  Defendant Minogue signed the 10-K for the

fiscal year 2012 and the certifications for all the relevant 10-Qs and 10-Ks.

     26.     Defendant Robert L. Bowen was, at all relevant times, Abiomed's CFO,

Vice President and Treasurer.  Defendant Bowen signed all the relevant 10-Qs and 10-Ks

and certifications for all the relevant 10-Qs and 10-Ks.

     27.     Defendants Minogue and Bowen are referred to collectively herein as the

"Individual Defendants."  Collectively, Defendant Abiomed and the Individual

Defendants are referred to herein as "Defendants."

## IV.    LEAD PLAINTIFFS' INVESTIGATION

     28.     As noted herein, Lead Plaintiffs' allegations are based upon the

investigation of Lead Counsel which included, among other things: review of Abiomed's

public filings with the SEC; Abiomed's press releases; publicly available trading

information; articles in the general and financial press; Abiomed's marketing and training

materials used during the Class Period; correspondence between Abiomed and the FDA;

and investment analyst reports.

     29.     Lead Plaintiffs' allegations are also based upon information provided by

former employees of Abiomed.  These former employees include the following:

> Confidential Witness 1 ("CW1") is a former Abiomed employee who worked in a
> clinical/surgical support position as a clinical representative from March 2011
> until April 2012.  In this position, CW1 was assigned to support physicians' use
> of the Impella 2.5 in surgical procedures in the catheterization laboratory.  CW1
> stated that during CW1's time at Abiomed, the role of the clinical representative
> became more sales-oriented and part of the job became to sell the Impella 2.5, not

just provide clinical support for it.  CW1 also attended sales meetings and medical trade shows for Abiomed, where CW1 was assigned to a booth and answered questions on products.

Confidential Witness 2 ("CW2") was a senior quality compliance and validation engineer at Abiomed from April 2008 through March 2011 who helped design changes to the Impella 2.5, approved design changes and fielded complaints on the device.

Confidential Witness 3 ("CW3") was an account manager at Abiomed from September 2008 until the end of March 2011.  While in this position, CW3 worked in sales, training and patient support.

Confidential Witness 4 ("CW4") was a clinical representative in cardiology at Abiomed in the southeast territory from August 2007 until September 2010.

Confidential Witness 5 ("CW5") was a clinical representative at Abiomed from February 2012 until February 2013 in the St. Louis, Missouri territory.  In this position, CW5 was present in the operating room and cath lab [catheterization laboratory] when procedures were done using the Impella 2.5.

Confidential Witness 6 ("CW6") was a territory manager, or sales representative, at Abiomed from October 2008 until February 2011 whose duties included selling Impella 2.5 to cardiologists, surgeons and hospitals in Arizona, Utah and New Mexico.

Confidential Witness 7 ("CW7") was a director of clinical operations for Abiomed in the Western part of United States from February 2009 until November 2011.  In that position, CW7 supported physicians' use of the Impella 2.5 by educating users, providing training on the device, troubleshooting problems and answering questions from users.  CW7 reported to Mike Howley, who reported directly to Defendant Minogue.  CW7 was present at procedures in which the Impella 2.5 was used.

30.     Except as alleged herein, the underlying information relating to

Defendants' misconduct and the particulars thereof is not currently available to Lead

Plaintiffs and the public, and lies exclusively within the possession and control of

Defendants and other insiders at the Company, thus preventing Lead Plaintiffs from

further detailing Defendants' misconduct at this time.

## V.      SUBSTANTIVE ALLEGATIONS

**A.      COMPANY AND DEVICE BACKGROUND**

31.     Abiomed was founded in 1981 to develop an artificial heart and reached

that goal in 2006, when the FDA approved the Abiocor for chronic heart failure.  In 2005,

Abiomed acquired Impella CardioSystemsAG, a German company that made micro

blood pumps for use during interventional cardiology procedures and heart surgery.  The

acquisition gave Abiomed access to patients who have severe heart problems but do not

need a new heart.  It also allowed the company to broaden its customer base to

cardiologists as well as surgeons.

32.     The Company's strategic focus and the primary driver of its revenue is

the Impella 2.5.  The Impella 2.5 catheter is a percutaneous micro heart pump with an

integrated motor and sensors.



33.     The Impella 2.5 catheter can be inserted via the femoral artery to reach the left ventricle of the heart where it is directly deployed to draw blood out of the ventricle and deliver it to the systemic circulatory system.  This function is intended to reduce ventricular work (resting the heart) and provide blood flow to vital organs.  The Impella 2.5 can pump up to 2.5 liters of blood per minute.

34.     Abiomed markets and promotes the Impella 2.5 through, *inter alia*, public statements by the Company; paid advertisements in medical journals and magazines; sales and clinical representatives who visit physicians, medical groups, and hospitals; and doctors it hires to give continuing education conferences on how to use the Impella 2.5.

35.     The Impella 2.5 is the main revenue source for the Company.  According to Abiomed's 10-K for FY 2012, in fiscal 2012, 85% of the Company's revenues were derived from sales of Impella products with most of that Impella revenue coming from the sales of one device, the Impella 2.5.

36.     Abiomed is a relatively small company.  The corporate offices in Danvers, Massachusetts housed about 150 employees during the Class Period.  According to CW1, this included marketing, engineering, finance, research and management personnel, including Defendants Minogue and Bowen.  The physical space of the office consists of one floor in an office building.  Thus, people were in close proximity to each other, according to CW1.

37.     CW1 also stated that Defendants Minogue and Bowen were very hands-on in the Company.  CW1 described Defendant Minogue as a "very involved leader."  CW5 said Mike Howley ("Howley") (VP of Global Sales and Marketing) was the face of

the sales force and that he micromanaged the sales and clinical teams, and reported

directly to Defendant Minogue.  CW1 stated that Howley was even considered

Minogue's "right-hand man."  Further, CW1 said that the Company held quarterly sales

meetings via conference call that were attended by clinical, sales and marketing

personnel.  CW1 said Defendant Minogue was on every one of these calls.  In addition,

CW1 said that there is also an annual off-site sales meeting held over two to three days,

which again includes all clinical, sales and marketing personnel and is attended by

Minogue and Bowen.

**B.**      **FDA REGULATORY OVERVIEW**

38.      Abiomed functions in a highly regulated industry.  Under section 201(h)

of the Federal Food, Drug and Cosmetic Act (the "Act"), 21 U.S.C. § 321(h), an

instrument is considered a "device" for purposes of the Act if it is intended for use in the

diagnosis of disease or other conditions or in the cure, mitigation, treatment, or

prevention of disease, or is intended to affect the structure or function of the body.

39.      There are two major processes by which medical devices requiring FDA

review, like the Impella 2.5, come to the American market:  (a) "Premarket Notification,"

sometimes referenced by its origins in the Act as the "510(k) process;" and (b) Premarket

Approval ("PMA").

40.      PMA, which is not at issue in this case, is the most stringent type of

device marketing application required by the FDA; it is based on a determination by the

FDA that the PMA contains sufficient valid scientific evidence that provides reasonable

assurance that the device is safe and effective for its intended use or uses.

14

41.     The 510(k) process, which Abiomed utilized to obtain clearance for the Impella 2.5, is somewhat analogous to the generic drug concept in that it is used to obtain marketing clearance for a device that is substantially equivalent in safety and effectiveness to another lawfully marketed device or to a standard recognized by the FDA when used for the same intended purpose(s).  In order to be eligible for 510(k) clearance, the new device must exhibit roughly the same safety and effectiveness characteristics as the comparison or "predicate" device.  It is not an "approval" process.  Rather, because of the nature of the laws underlying this process, a successful submission is deemed to be "cleared."  Clearance of a 510(k) submission by the Center for Devices and Radiological Health ("CDRH"), a branch of the FDA, confers permission to market the new device *only for the cleared indications for use*.

42.     In addition to a formal PMA or 510(k) application, an investigational device exemption ("IDE") allows the investigational device to be used in a clinical study in order to collect safety and effectiveness data required to support a PMA application or a 510(k) submission to FDA.

43.     Under each process, the FDA has separate and very strict guidelines on what companies can do to label (or market) medical devices.  The FDA and courts have interpreted labeling to include most, if not all, advertising or marketing of a medical device.

*Labeling Regulations For 510(k) Uses*

44.     For cleared medical devices such as the Impella 2.5, "off-label" use means any use that is not included in the cleared "indications for use."  Marketing and promotion of such off-label uses is strictly prohibited.

45.     For example, 21 C.F.R. § 801.6 and 21 U.S.C. § 352(a) provide that making any false or misleading statements in the labeling of a device constitutes improper "misbranding."  A device is also considered "misbranded" under 21 U.S.C. § 352(o) if the device is introduced into the marketplace for a particular use for which it has not been 510(k) cleared or PMA approved, as required by 21 U.S.C. § 360(k).

46.     Further, 21 C.F.R. § 807.81(a)(3)(ii) requires additional 510(k) clearance if there is "major change or modification in the intended use of the device."  If a firm does not have a 510(k) clearance and implements a major change or modification, then the device is considered "adulterated" under 21 U.S.C. § 351(f)(1)(B).

47.     The consequences for misbranding or adulterating (*i.e.*, off-label promotion) of FDA "cleared" devices is severe.  Misbranded and adulterated devices are at risk of being banned or recalled by the FDA, the FDA could place operating restrictions on a company engaging in off-label marketing or enjoin them from doing so, and companies or persons engaged in such practices are at risk for civil and criminal penalties or prosecution by the Department of Justice ("DOJ").

***Labeling Regulations for IDE Exempt Uses***

48.     In addition to its limited 510(k) clearance, Abiomed also received approval to conduct two studies on the Impella 2.5 for uses beyond those that were 510(k) cleared, under the IDE exemption.  While a device is part of an ongoing investigational device study, it is subject to labeling regulations pertaining to medical devices that are found in Title 21 of the Code of Federal Regulations ("C.F.R."), Part 812.

49.     For example, section 812.5 (Labeling of investigational devices)

16

provides, in part:

> (a) *Contents.* An investigational device or its immediate package shall bear a label with the following information: the name and place of business of the manufacturer, packer, or distributor (in accordance with 801.1), the quantity of contents, if appropriate, and the following statement: "CAUTION--Investigational device. Limited by Federal (or United States) law to investigational use." The label or other labeling shall describe all relevant contraindications, hazards, adverse effects, interfering substances or devices, warnings, and precautions.

> (b) Prohibitions. The labeling of an investigational device shall not bear any statement that is false or misleading in any particular and shall not represent that the device is safe or effective for the purposes for which it is being investigated.

50.     Moreover, section 812.7 (Prohibition of promotion and other practices)

provides:

> A sponsor, investigator, or any person acting for or on behalf of a sponsor or investigator shall not:

> (a) Promote or test market an investigational device, until after FDA has approved the device for commercial distribution.

> (b) Commercialize an investigational device by charging the subjects or investigators for a device a price larger than that necessary to recover costs of manufacture, research, development, and handling.

> (c) Unduly prolong an investigation.  If data developed by the investigation indicate in the case of a class III device that premarket approval cannot be justified or in the case of a class II device that it will not comply with an applicable performance standard or an amendment to that standard, the sponsor shall promptly terminate the investigation.

> (d) Represent that an investigational device is safe or effective for the purposes for which it is being investigated.

### Dissemination of Information on Off-Label Uses

51.     While devices may only be labeled, marketed and promoted for the uses

that the FDA has approved or cleared, the FDA does not prohibit physicians and hospitals

from "off-label" uses of medical devices.  As such, FDA regulations allow the limited

exchange and dissemination of scientific information on a product's unapproved uses only in specific circumstances, including: (a) responses to **unsolicited** requests from physicians; (b) non-promotional and independent continuing medical education ("CME") programs; and (c) peer-reviewed scientific and medical journals.

52.     A company can respond to **unsolicited** requests from physicians regarding unapproved/non-cleared uses of legally marketed products.  To be "unsolicited," an inquiry must not have been prompted by any design or artifice by the company through sales and marketing efforts such as baiting, probing or targeting to solicit or generate the physician question or request regarding the off-label use.  A company can fund or support independent third-party CME programs that may include discussions of off-label uses, provided that the program is non-promotional and independent from the substantive influence of the supporting company.  The FDA examines whether and the extent to which the company is in a position to influence the presentation of information related to its products.  Finally, a company can distribute peer-reviewed scientific or medical journal articles or reference publications that discuss off-label uses.  The articles and publications must address adequate and well-controlled clinical investigations that are considered scientifically sound by experts with scientific training to evaluate the safety or effectiveness of the drug, biologic, or device.

53.     Further, the FDA has warned against *post-hoc* analyses and deviation from the analysis populations specified in a study's protocol such as that engaged in by Abiomed as discussed herein.

C.      **IMPELLA 2.5 LIMITED FDA CLEARANCE**

54.      In June 2008, Abiomed received 510(k) clearance from the FDA for the Impella 2.5 for "partial circulatory support using an extracorporeal bypass control unit, for periods up to 6 hours.  It is also intended to be used to provide partial circulatory support (for periods up to 6 hours) during procedures not requiring cardiopulmonary bypass.  The [Impella 2.5] also provides pressure measurements which are useful in determining intravascular pressure."

55.      Based on its 510(k) clearance, Abiomed may not label, market or promote the Impella 2.5 for any use *other than* for: (a) partial circulatory support using an extracorporeal bypass control unit, for periods up to 6 hours; (b) for partial circulatory support (for periods up to 6 hours) during procedures not requiring cardiopulmonary bypass; and/or (c) to provide pressure measurements which are useful in determining intravascular pressure.  Any promotion or marketing beyond these limited uses violates FDA regulations.

56.      Despite the limitations on promotion and marketing, physicians can use the Impella 2.5 for non-cleared uses.  Common non-cleared uses for which the Impella 2.5 is used is during high-risk percutaneous coronary intervention ("high-risk PCI"), commonly known as angioplasty, and during procedures on patients with acute myocardial infarctions ("AMI"), commonly referred to as a heart attack.  Further, doctors sometimes use the device for more than six hours.

57.      Although the Impella 2.5 is sometimes used for high-risk PCI and in patients with AMI, the IABPs are the main competition for Impella 2.5 and still dominate this market as they are used in the majority of such procedures.   IABPs are mechanical

devices that increase cardiac output and coronary blood flow.  IABPs have been sold

since the 1960s and are much less expensive than the Impella 2.5 – the Impella 2.5 costs

approximately $22,000 per device, while an IABP costs approximately $800 - $1000 per

device.  Both the Impella 2.5 and the IABP are disposable, meaning each device can only

be used once and then the entire device is discarded.  Approximately 124,000 IABPs are

used each year in the United States, compared to approximately 4,000 Impella 2.5s each

year.  Thus, a study showing that the Impella 2.5 is superior to the IABP would be very

lucrative to Abiomed.  Moreover, a successful study would allow Abiomed to apply for

PMA or 510(k) clearance for use in high-risk PCI and/or for AMI patients, approval

which would allow Abiomed to legally market the product for such use.

**D.      THE PROTECT II STUDY**

58.      In August 2007, Abiomed received approval from the FDA, under the

IDE exemption, to begin a clinical trial comparing the Impella 2.5 to the IABP in high-

risk PCI, specifically designed to measure major adverse events at 30 days.  The study

was known as the "Protect II" study.

59.      On December 6, 2010, however, Abiomed announced the termination of

the Protect II study based on a futility determination by the Data Safety and Monitoring

Board because it could not reach its primary end points.  In its press release, Abiomed

attributed the results leading to the futility determination to "unanticipated confounding

variables related to the use of rotational atherectomy in the study."  The study failed and

was terminated early and did not achieve the desired results.

60.      CW2, a senior quality compliance and validation engineer at Abiomed,

confirmed that the Protect II study "didn't achieve the desired results" and the Company

"knew they weren't going to meet the acceptance criteria of the FDA."  Likewise, CW 1 and CW3 confirmed that the Protect II study failed and did not achieve the desired results.

61.     After the termination of the study, Abiomed continued to collect and analyze data, including at 90 days, and draw its own conclusions from the data.  Using this cherry-picked data, during the Class Period, as described by former employees, Abiomed continued to compare the two products and to improperly make claims that the Impella 2.5 was superior to the IABP, despite the fact that the study was terminated and the fact that Impella 2.5 still did not have clearance for high-risk PCI.  Specifically, Abiomed claimed that the results demonstrated that use of the Impella 2.5 results in less major adverse events, that the Impella 2.5 is more cost-effective over time based on the costs associated with the major adverse events that occur with the use of the IABP, and that the Impella 2.5 is safe for use in high-risk PCI.

62.     It was not until September 4, 2012, that the full data from the study was published online in *Circulation*.  The *Circulation* paper concluded that "Impella 2.5 did not result in a superior outcome of the primary endpoint at 30 days."  The paper also reported the results of a more promising secondary analysis suggesting a possible benefit for the device at 90 days, but rather than hyping these results as Abiomed had done, the authors wrote: "[s]ince the difference in 30 day MAE [major adverse events] did not reach statistical significance for the entire study, the analysis of 90 day events remains exploratory."

**E.      THE RECOVER II STUDY**

63.      In March 2008, Abiomed received approval from the FDA to begin

another study for the Impella 2.5, under an IDE exemption, comparing the Impella 2.5 to

the IABP in hemodynamically unstable patients undergoing a PCI procedure due to AMI,

a use for which the Impella 2.5 has not been cleared.  The study was known as the

Recover II study.

64.      In September 2009, Abiomed suspended the study and in September

2010, Abiomed terminated the study for insufficient enrollment.  Thus, the study failed

and Abiomed did not obtain 510(k) clearance for this use, and, as such, could not market

or promote the Impella 2.5 for such use or compare it to the IABP for such use.

**F.      DEFENDANTS ENGAGED IN WIDESPREAD OFF-LABEL
        MARKETING OF THE IMPELLA 2.5 AND IGNORED AND
        MISREPRESENTED CITATIONS FROM THE FDA REGARDING SUCH
        PRACTICES**

        **1.   Pre-Class Period Citations From The FDA**

65.      Even before the start of the Class Period, beginning in early 2010, the

FDA repeatedly informed Abiomed that it was improperly marketing the Impella 2.5

beyond its FDA-cleared indications.   Yet, Defendants concealed and misrepresented the

warnings from the FDA and continued to market the Impella 2.5 off-label.

66.      On January 28, 2010, the FDA sent Abiomed a letter ("January 2010

FDA Letter") objecting to "promotional activities [the FDA] has observed related to

Abiomed's promotion of the Impella [2.5]."  At that time, Abiomed was in the middle of

the Protect II and the Recover II studies, which subjected it to regulations at 21 C.F.R.

§ 812.7.  The FDA cited Abiomed marketing materials which improperly compared the

Impella 2.5 with the IABP and which improperly promoted the product for high-risk PCI

and AMI, non-cleared uses.

67.    The FDA stated that Abiomed was:

promoting the Impella 2.5 for high risk PCI and AMI, in violation of 21 CFR
812.7(a) and (d), which provide that you may not promote or test market an
investigational device, until after FDA has approved the device for commercial
distribution, and you may not represent that the Impella 2.5 is safe and effective
for the purposes for which it is being investigated.

The FDA also stated that it considered the Impella 2.5 "adulterated" under 21 U.S.C.

§ 351(i) and "misbranded" under 21 U.S.C. § 352(o).

68.    The January 2010 FDA Letter stated that the objectionable marketing and

promotional activities included the following (specifically noting that the list was not

intended to be an all inclusive list of problems with Abiomed's marketing activities and

reminding Abiomed that it was responsible for ensuring its compliance with the Act and

applicable regulations):

- An advertisement placed in [Cath Lab Digest] Magazine – Sept. 2009
  comparing the Impella 2.5 to the IABP and claiming "[d]emonstrated
  hemodynamic superiority to IABP . . . in violation of section 812.7(d),
  which prohibits the representation that a device is safe and effective for
  the purposes being studies under the investigation." The FDA claimed
  that this "comparison statement can be interpreted as an efficacy statement
  regarding the superiority of the Impella to IABP."

- The same advertisement also showed "that Impella 2.5 has been used in
  high risk PCI and AMI" in violation of 21 C.F.R. § 812.7(a), which
  "prohibits the promotion of an investigational device."

- A press release representing that "the Impella 2.5 is safe and effective for
  use in high risk PCI in violation of 21 CFR 812.7(d) . . .  Since the use of
  the Impella 2.5 for high risk PCI is currently studied under an IDE, the
  statement that high risk PCI is 'safe' and provides 'excellent support' is a
  violation of CFR 812.7(d)."

69.     On March 4, 2010, Abiomed responded to the January 2010 FDA letter in a letter from Abiomed's Senior Vice President of Global Product Operations, William Bolt ("Bolt").  As to the first bullet above, Abiomed stated it would remove the term "demonstrated" from the statement "[d]emonstrated hemodynamic superiority to IABP" in any of its materials.  As to the second bullet, Abiomed stated it would remove any materials in its possession that combine data charts that appeared in the advertisement with claims about the device.  As to the last bullet, Abiomed stated it would remove materials claiming the Impella 2.5 is "safe" or that it "provides excellent support" and remove the press release from its website.

70.     The FDA responded to Abiomed's letter in a March 29, 2010 letter addressed to Bolt, informing him that Abiomed's response to the January 2010 FDA Letter in regard to the advertisement (the first two bullets above) was inadequate and that Abiomed needed to further revise its marketing materials. The FDA also requested that Abiomed submit the revised marketing materials that had previously contained claims that the Impella 2.5 is "safe" or that it "provides excellent support."

71.     On April 7, 2010, Bolt wrote to the FDA and stated that Abiomed removed the cited advertisement from its website and "removed any existing promotional materials that had been generated from [the advertisement]."  Bolt also stated that Abiomed reviewed its marketing materials and website and there were no other materials beyond the cited press release claiming that the Impella 2.5 is "safe" or that it "provides excellent support."

72.     Despite the significance of these communications, the Company did not disclose the receipt of the January 2010 FDA Letter or its ongoing communications with

the FDA regarding its off-label promotional activity.  It was not until June 2011 – almost

one and one–half years later, that Abiomed publicly acknowledged the January 2010

FDA Letter, and even then, it was only after Abiomed received an official – and public –

warning letter.

        **2.**      **The June 2011 Warning Letter**

      73.     On June 10, 2011, the FDA issued an official Warning Letter ("2011

FDA Warning Letter"), addressed to Defendant Minogue, stating that Abiomed continued

to violate the Act in the same ways for which the FDA had previously cited Abiomed.

The letter stated that Abiomed's marketing materials continued to improperly compare

the Impella 2.5 to the IABP and promote the device for non-cleared uses, just as

Abiomed had been cited for in 2010.  Moreover, Abiomed was also cited in the letter for

improperly making claims that the Impella 2.5 improved cardiac power output which

improves mortality, without a proper study or indication to make such claims.

      74.     Specifically, the FDA stated "[o]ur review of [Abiomed's] promotional

materials indicate that Abiomed is making claims that we stated were inappropriate in a

January 28, 2010 letter to your firm.  These claims represent a major modification to both

the intended use and the indications for use of the device."   The letter stated that,

although the study had been terminated since the January 2010 FDA Letter, Abiomed's

continued unsupported comparative claims violate 21 C.F.R. § 801.6, stating, in part:

> The Office of Compliance (OC) in the Center for Devices and Radiological Health
> (CDRH) reviewed an advertisement, labeling pieces, and your firm's website at
> www.abiomed.com the IMPELLA RECOVER LP 2.5 device on May 12, 2011.  Our
> review of your firm's promotional materials indicate that ABIOMED is making
> claims that we stated were inappropriate in a January 28, 2010, letter to your
> firm. These claims represent a major modification to both the intended use and the
> indications for use of the device.   The objectionable claims include the following: for

- An advertisement placed in the September, 2010, Cath Lab Digest (vol. 18, no.9). The advertisement shows a hand puncturing a red balloon with a pin. Printed on the balloon is text that reads, "Old ideas about heart recovery." The caption below the balloon reads in part, "After 40 years, there is something other than the intra-aortic balloon [pump] (IABP) for circulatory support in the Cath lab . . . Cardiac Power Output (CPO) is the #1 correlate to mortality for [acute myocardial infarctions] (AMI) in cardiogenic shock patients . . . In the latest USPELLA registry, the CPO of shock patients was observed to increase 120% from 0.5± 0.2 prior to IMPELLA to 1.1±0.2 on IMPELLA (p=0.02)."

As we stated in our January 28, 2010, letter, "comparative statements can be interpreted as efficacy statements regarding the superiority of the IMPELLA RECOVER LP 2.5 to IABP." When we sent you the January, 2010, letter, ABIOMED had an ongoing investigational device study, G050017, and we advised your firm that the claims violated the regulations at 21 CFR 812.7(d), which prohibit the representation that a device is safe and effective for the purposes being studied. Although the study has since been terminated, the unsupported comparative claims violate 21 CFR 801.6.

75.     Moreover, the 2011 FDA Warning Letter also admonished Abiomed for marketing off-label uses for Impella 2.5 in violation of 21 C.F.R. § 807.81(a)(3)(ii), which requires a new 510(k) clearance for any change or modification that "could significantly affect" either the safety or the effectiveness of a device.  Thus, the FDA stated that the Impella 2.5 is "adulterated" under 21 U.S.C. § 351(f)(1)(B) and "misbranded" under 21 U.S.C. 352(o).  The relevant parts of 2011 FDA Warning Letter read as follows:

On page 9 of your firm's presentation to the 2010 Transcatheter Cardiovascular Therapeutics meeting, your firm claimed that use of the IMPELLA RECOVER LP 2.5 in AMI Shock patients improves hemodynamics, and on page 10 your firm states that the use of the IMPELLA RECOVER LP 2.5 improves cardiac output, which is then linked to lower mortality rates. Both of these indications would need to be supported with an appropriately designed clinical study performed under an Investigational Device Exemption (IDE). . .

Statements such as the ones cited above represent a major change or modification in the intended use of your firm's device that requires a new premarket notification. 21 CFR 807.81(a)(3)(ii). Therefore, the IMPELLA RECOVER LP

2.5 device is adulterated under section 501(f)(1)(B) of the Act, 21 U.S.C.C. 351(f)(1)(B), because your firm does not have an approved application for premarket approval (PMA) in effect pursuant to section 515(a) of the Act, 21 U.S.C. 360e(a), or an approved application for an IDE under section 520(g) of the Act, 21 U.S.C. 360j(g). The device is also misbranded under section 502(o) of the Act, 21 U.S.C. 352(o), because your firm did not notify the agency of its intent to introduce it into commercial distribution for the intended uses discussed above, as required by section 510(k) of the Act, 21 U.S.C. 360(k).  For a device requiring premarket approval, the notification required by section 510(k) of the Act, 21 U.S.C. 360(k), is deemed satisfied when a PMA is pending before the agency.  21 C.F.R. 807.81(b). . .

The Office of Compliance requests that ABIOMED, Inc., immediately cease marketing the IMPELLA RECOVER LP 2.5 for unapproved uses such as those described above.

76.    The 2011 FDA Warning Letter was published on the FDA website in June, 2011.  In response to an inquiry, as reported in a June 28, 2011 Boston Business Journal article, an Abiomed spokeswoman stated that "[t]his letter addresses specific promotional items from 2010. . . We are working with the FDA to ensure all of our promotional materials comply with the agency moving forward."  Further, a June 28, 2011 Wunderlich Securities report stated that, in regard to the cited balloon advertisement in the *Cath Lab Digest* which improperly compared the Impella 2.5 to the IABP, improperly made claims about the Impella 2.5 for non-cleared uses and improperly made claims regarding the device regarding cardiac power output and mortality, "Abiomed CEO [Minogue] indicated that this type of advertisement is no longer being used, so this issue should be easy to resolve."  The Wunderlich Securities report further stated that, "these issues are usually resolved fairly easily, as long as the company takes the issue seriously."

77.    Yet, Defendants ***did not*** take the FDA warnings seriously and Abiomed continued to engage in widespread improper marketing of the exact type the FDA had

27

cited Abiomed.  In fact, CW1 said Abiomed senior management "felt they were above

reproach" and that senior management, including Defendants Minogue and Bowen,

"didn't take them [the FDA letters] seriously."  Further, despite the FDA's concerns,

CW1 stated that the sales and clinical staff were not instructed to change their marketing

practices.  Indeed, as CW1 relayed, when the sales and clinical staff were told about the

FDA concerns at a national meeting that both Defendants Minogue and Bowen attended,

management trivialized the FDA concerns, saying the ad is "just a balloon."  Likewise,

CW2 said Abiomed "didn't change anything" after being notified by the FDA.  The

Impella 2.5 was a "cash cow" for the company, so they continued "to motivate physicians

to use it as much as possible."   CW7 likewise stated that the Company's statements that

the matter with the FDA was resolved were false.

### 3.  Defendants Continued To Engage In Widespread Off-Label Marketing

78.     Indeed, the issues the FDA complained of continued during the Class

Period as Abiomed engaged in pervasive off-label marketing of the Impella 2.5 beyond

its FDA cleared indications.  Moreover, senior management, including Defendants,

engaged in, and encouraged, these practices.

#### a.  Defendants' Public Promotional Materials Improperly Marketed The Impella 2.5 For Off-Label Uses

79.     During the Class Period, Defendants' widely-disseminated public

promotional materials that included improper off-label marketing of the type for which

the FDA previously cited Abiomed and which Abiomed asserted it would refrain from

using.  For example, during the Class Period, on Abiomed's website under "Patient

Stories," Abiomed described several uses of the Impella 2.5 that went beyond its cleared

use.  One story described a patient who experienced a massive heart attack, stating "[h]e

received three stents to open up his arteries . . . during a follow-up appointment, [his] cardiologist . . . determined that [the patient's] artery needed to be opened up urgently in order to restore his blood flow.  However, he was unable to withstand invasive surgery, so he received the Impella 2.5, allowing [the doctor] to quickly open up the artery and regain [the patient's] heart function."  PCI is the only non-invasive way to have restored this patient's blood flow.  As use of the Impella 2.5 during PCI procedures is not within the cleared use of the device, this constitutes off-label marketing.

80.    Abiomed also maintained an "AbiomedImpella" YouTube channel which included several videos discussing off-label use.  One such video discussed the use of the Impella in a patient whose heart was failing due to a virus.  The narrator stated, "the key to her recovery was in not having a transplant."  Further, a heart surgeon interviewed regarding the case states, "if we can get to the patient early enough we can actually recover those hearts."  Because the Impella has not been cleared for use in place of heart transplantation, this is off-label promotion of the device.

81.    Moreover, in an interview on the February 7, 2012 edition of CNBC's "Mad Money," Defendant Minogue engaged in off-label discussions regarding the Impella.  Minogue compared the Impella to the IABP and claimed that the Impella can be used in place of the IABP, (including references to Abiomed's claims regarding the Protect II study and the superiority and cost effectiveness of the Impella), despite the FDA's repeated and specific citations of Abiomed for such improper comparative statements.  Specifically, Minogue stated:

> Payers and providers want to find ways to get better outcomes, not just at the hospital *but out [at] 90 days and in our studies we show a 56% reduction in adverse events when they leave the hospital to 90 days*.

So this is the world's smallest heart pump. It can be put through a small hole in the leg to get to the heart.  Procedures today patients are riskier, sicker and their getting, the procedures are less invasive.  So you can put this pump in within minutes through a small hole in the leg.  It will sit in the left ventricle, it will pump 2.5 to 5 liters of flow.[2]  This little pump.  So here's the motor, and this is the world's smallest heart pump, right in this key chain.  This is spinning at 50,000 revolutions per minute.  And this helps the heart rest and recover or provide protection.   So there's two types of patients.  ***There's the patient that has a bad heart and they want to go through a minimal evasive procedure or their turned down for surgery.  So Bob Ballou in Texas is in hospice, surgeons are turning him down.  Intervention cardiologist, who's committed to trying to improve this patient's outcomes, put the Impella in, puts it in, does a procedure. The patient, as we see in our studies, their heart gets better they improve.  And on the emergency patients, we have folks like Mike Lenny, who's a firefighter that has a massive heart attack, arrives at the hospital getting CPR.  They use the pump to help rest his heart and he gets better, he's back now with his own heart.  He didn't have to have surgery, he didn't have to get a ICD, he didn't have to get a transplant.  So this is what we are focused on.  Again heart recovery is very special***…

And we also have a lot of clinical data coming*.  And this [holds up an IABP] is 124,000 times a year, this [holds up an Impella] is about 4,000 today, so we are still in the early innings of our ramp…And it's cost effective.*  And patients get to keep their own heart.

82.    Moreover, in Abiomed's SEC filings and conference calls during the

Class Period, Defendants repeatedly compared the Impella 2.5 to the IABP and made

claims that the Protect II study showed that the Impella 2.5 was superior to the IABP:

- During an August 4, 2011 conference call, Defendant Minogue stated that "[t]o summarize PROTECT II, the Impella patients were treated more aggressively and had significantly better outcomes at 90 days."

- In its 10-Q for Q1 2012, filed with the SEC on August 5, 2011 the Company stated that Protect II "showed a statistically significant 21% reduction in major adverse events compared to the IAB at 90 days per protocol."

---

[2] Minogue's statement that "it will pump 2.5 to 5 liters of flow," refers to both the Impella 2.5 and the Impella 5.0.  The Impella 5.0 is similar to the Impella 2.5 except that it can pump up to 5 liters, as compared to 2.5 liters, of blood per minute.  The 510(k) limited clearance for the Impella 5.0, which Abiomed received in 2009, is almost identical to Impella 2.5 as it is cleared for "circulatory support using an extracorporeal bypass control unit, for periods up to 6 hours.  It is also intended to be used to provide circulatory support (for periods up to 6 hours) during procedures not requiring cardiopulmonary bypass. The [Impella 5.0] also provides pressure measurements which are useful in determining intravascular pressure."  Thus, Minogue's statements involve off-label promotion of the Impella 2.5 and the Impella 5.0.

- On November 7, 2011, Abiomed filed its 10-Q for Q2 2012, and stated that the Protect II study "showed a statistically significant 21% reduction in major adverse events compared to the intra aortic balloon at 90 days per protocol."

- On February 3, 2012, Abiomed issued an 8-K and press release that stated that "[a]dditional Protect II clinical analyses were presented at TCT 2011, which demonstrated that patients undergoing extensive revascularization showed the most clinical benefit in the Impella arm to 90 days."

- During a February 3, 2012 conference call, Defendant Minogue stated that "in PROTECT II, the economic study revealed that the Impella patients had lower hospital charges at 90 days, driven by 47% reduction in repeat revascularization and 67% lower charges per readmission as compared to the intra-aortic balloon pump."

- In Abiomed's June 4, 2012 10-K for 2012, the Company stated that "in November 2011, we announced additional analysis of the results from the Protect II study, including those patients enrolled following the initiation of the interim analysis, which showed a statistically significant 22% relative reduction in major adverse events compared to the IAB at 90 days per protocol (p=0.023), a 52% relative reduction in repeat revascularization (p=0.024) and a 56% relative reduction in material adverse events post hospital discharge (p=0.002). Furthermore, additional data analysis of the clinical data from the Protect II trial revealed that more aggressive revascularization is beneficial for patients with coronary artery disease and reduced left ventricular function."

- On Abiomed's August 2, 2012 conference call, Defendant Minogue stated that "PROTECT II, in conjunction with the economic study revealed that the Impella arm at 90 days had a 56% reduction in major adverse events from discharge had half the rate of repeat revascularizations and had 67% less per readmissions in hospital charges."

These statements in Abiomed's SEC filings and conference calls abruptly stopped after August 2, 2012 and did not appear in Abiomed's August 6, 2012 10-Q – around the same time that Abiomed pulled all its marketing materials and was audited by the FDA.

b.      Defendants Utilized Marketing Materials With Customers That Promoted
        Off-Label Uses And Trained Sales and Clinical Staff To Off-Label Market
        During The Class Period

83.      Moreover, numerous former employees described Abiomed's pervasive

off-label marketing and that Abiomed and senior management utilized marketing

materials that promoted off-label uses of Impella 2.5, including comparisons with the

IABP and promotion for non-cleared uses, and trained sales and clinical representatives

on off-label marketing, including how to prompt and steer physicians to ask about off-

label uses of the Impella 2.5.

84.      Former employees relayed that a major focus in the sales and clinical

marketing initiative was Abiomed's misleading claims regarding Protect II and

comparisons of the Impella 2.5 to the IABP.  Both CW1 and CW5, former Abiomed

clinical representatives, described how sales and clinical representatives were provided

with "talking points" about Protect II and how to discuss the superiority of the Impella

2.5 over the IABP, including as to adverse events and cost-effectiveness.  CW5 relayed

that a lot of the marketing and training materials the Company gave the representatives in

connection with their visits with customers related to Protect II, including a "Protect II

slide deck" to use with customers.  Materials provided to sales and clinical

representatives in regard to their discussions with physicians and hospital administrators

about Protect II included the following "key messages":

- "Overall, the Impella arm demonstrated significantly lower major adverse events
  (MAE) at 90 days."

- "Impella patients experienced lower hospital charges at 90 days, influenced by
  significantly reduced revascularization and a overall 56% reduction in out-of-
  hospital major adverse events."

- "[T]he relative benefit continued to improve at 90 days and a learning curve on the Impella arm was noted, leading to improved outcomes in the later phase of the trial."

85.     Moreover, the materials instructed the representatives regarding how to address criticisms of the Protect II study that might be raised by a customer.  For example, if a customer stated that there is "not much difference between IAB and Impella," the response was "There <u>Are</u> Differences," including reduction of major adverse events, cost, and that "Impella provided more robust hemodynamic support than IAB with a more robust level of Cardiac Power Output during support."

86.     The materials also included the following "Conclusions" from Protect II:

- "The use of Impella for hemodynamic support during high risk PCI is safe."

- "Impella arm had strong trends towards superior clinical outcomes for the entire intent-to-treat population with significant reduction of the MAE rate in pre-specified per protocol population at 90 days."

87.     Further, both CW1 and CW5 relayed that the training and marketing slides they were provided discussed the cardiac power output of Impella 2.5 and linked it with lower mortality rates.  As CW1 described, this was improper, and a concern of the FDA, because Abiomed improperly linked two unrelated pieces of data and made claims about it: one piece of data was that Impella 2.5 lowered cardiac power output and a completely separate study that was unrelated to the Impella 2.5 suggested that higher cardiac power output resulted in higher mortality rates.  Abiomed improperly linked the two and claimed that because Impella 2.5 leads to lower cardiac output, it decreases mortality in AMI patients and without studies or an indication to support such claims.

88.     Moreover, CW7, a former Director of Clinical Operations, who reported to Mike Howley (who reported directly to Defendant Minogue) and supported

physicians' use of the Impella 2.5 by educating users, providing training, and troubleshooting problems, stated that Abiomed used "every which way to market the Impella 2.5 and pushed it in ads and literature."   Indeed, CW2 said that Abiomed senior management knew "what [the Impella 2.5] could do and not do" when they made the claims about the efficacy of the device beyond the approved uses in Abiomed's marketing materials and that they knew Abiomed did not have the clinical studies to support the claims they were making.

89.     CW3, a former sales account manager at Abiomed, said Abiomed's marketing materials promoted off-label uses.  CW3 recalled having concerns with the Impella 2.5 marketing materials and wondering "do we really put this in writing?"  CW3 further stated that all of senior management at Abiomed "knew the problem" – that the marketing materials they were distributing were improper.  In fact, CW3 "called [the Company] out" on marketing the Impella 2.5 for off-label uses because CW3 and other account managers in the western part of the country were "uncomfortable" promoting the device off-label.  Specifically, CW3 told Mike Howley, the VP of Global Sales and Marketing, who reported directly to Defendant Minogue, that the marketing materials for Impella 2.5 were "inaccurate and can't be distributed."   In response, CW3 was "blown-off" and management had "no intention to resolve the problem."

90.     Additionally, CW7 confirmed that Abiomed promoted the device for non-cleared uses and that the training materials supported off-label marketing.  CW7 also said that a big initiative where Abiomed promoted off-label use of the Impella 2.5 was in the area of Electrophysiology ("EP").  CW1 described that EP procedures usually take more than six hours.  CW7 relayed that Abiomed had "an initiative to expand [Impella

2.5] uses into EP."  CW7 said Penny Anderson, Abiomed's Director of

Electrophysiology, would host dinners with doctors specifically for the purpose of

discussing using the Impella 2.5 in EP procedures.  CW1 confirmed that this initiative

existed during the Class Period and that Abiomed aggressively marketed the Impella 2.5

for EP procedures.  CW7 also said that, through Abiomed's speaker's bureau, in which it

brought in doctors to give CME presentations on its products, Abiomed often sponsored

presentations aimed at off-label uses of the Impella 2.5, including using the device in EP

procedures.  Further, CW7 stated emails from senior management support CW7's

statements regarding Abiomed's improper marketing of the device.

91.     CW2, a former senior quality compliance and validation engineer at

Abiomed who designed changes to the Impella 2.5, approved design changes and fielded

complaints regarding the device, confirmed that Abiomed improperly marketed the

device and "pushed the limit of what it actually could do even without clinical proof."

CW6, a former sales territory manager whose duties included selling Impella 2.5 to

cardiologists, echoed CW2 and stated that the Company "always pushed the envelope"

on Impella 2.5 use and marketing.

92.     Further, CW4, a former clinical representative at Abiomed, said CW4

taught physicians on how to use the Impella 2.5 and, at senior management's direction,

during the process CW4 discussed the patient population of potential users with doctors.

CW4 said Abiomed would help the doctors identify candidates to use the Impella 2.5 on,

including high-risk PCI patients.

93.     To further the off-label marketing of the Impella 2.5, Abiomed

management also trained its sales and clinical representatives to prompt, or guide,

physicians to inquire about off-label uses, which is prohibited by FDA regulations.  CW1 stated that Abiomed trained its sales representatives to review cases with doctors in order to prompt doctors to ask about the off-label uses of Impella 2.5, which is prohibited. CW1 said sales "reps were instructed to steer physicians to use the device off-label." CW1 said sales representatives were trained to review cases with doctors during sales calls because if a sales representative had the opportunity to review cases with doctors, they could often influence doctors to ask about off-label use.  Sales representatives were instructed to ask about specific cases with physicians and to ask "are you doing any high risk interventions," which often prompted a discussion of off-label uses.

94.     CW1 also stated that the technique of discussing cases with doctors "guides" doctors to use the Impella 2.5 for lengthier procedures beyond six hours. Moreover, CW3 stated that Abiomed instructed representatives to respond to a question from a doctor regarding using the device for more than six hours by saying, "The government doesn't treat patients, the government makes policies.  Doctor, you treat patients, so you should decide how long to use it."

95.     Additionally, CW1 attended sales trainings and personally heard sales representatives being instructed to "go into the cath lab and look for high risk patients and tell them [physicians] they need to use the Impella."

96.     Moreover, CWs 6 and 7 both described that field staff were compensated based on how many devices were sold and used.  CW7 said that both sales and clinical were compensated on how many devices were used in procedures.  Incentives included cash bonuses, gift cards and prizes. The incentives were paid based on "quotas" set by management; such as, sales and implants for a week, month and quarter.  CW7 said sales

employees were paid a low base salary and a high commission; whereas clinical employees were paid a high base salary with a low commission.  Likewise, CW6 stated that representatives were compensated each time the Impella 2.5 was sold and used.

### 4. The FDA's Continued Scrutiny And Admonishment Of Abiomed

97.     Throughout the Class Period, the FDA continued to pursue the issues it had raised in its 2011 FDA Warning Letter with Abiomed and did not deem the 2011 FDA Warning Letter resolved, specifically in relation to Abiomed's claims regarding its "Protect II" analysis and the comparisons of the Impella 2.5 with the IABP, marketing of the Impella 2.5 for non-cleared uses, and claims regarding cardiac power output.   After the 2011 FDA Warning Letter was issued, there were multiple communications between Abiomed and the FDA regarding Abiomed's improper marketing practices.

98.     Moreover, on February 24, 2012 Abiomed and the FDA had a meeting, in part to discuss Abiomed's improper marketing practices, including in regard to claims regarding the Protect II study and promotion for high-risk PCI, which was attended by Defendant Minogue, as well as other Abiomed executives, including SVP of Global Product Operations William Bolt and COO David Weber.  Internal FDA communications and communications between the FDA and Abiomed demonstrate that a purpose of the meeting was to discuss the Protect II study and the FDA's concerns, including safety concerns, in regard to the claims Defendants were making in regard to that study:

- On February 14, 2012, Carol Pekar, Director of Clinical and Regulatory Affairs at Abiomed, wrote to FDA officials, "The intention of the meeting on the 24th is to address any and all concerns on the agency's part regarding the safety of the Impella device."

- On January 10, 2012, Albert Rodriguez, lead reviewer of Impella at FDA, wrote in an internal FDA memo, "I have attempted to get a time in Feb

due to the urgency of this meeting." ABMD has never told investors that Impella is the subject of "urgent" safety issues at FDA.

- The February 24, 2012 meeting was titled, "Abiomed Face-to-Face – PROTECT II Study Discussion."

- On January 13, 2012, Dr. Bram Zuckerman, Director of the FDA Division of Cardiovascular Devices, wrote to ABMD's CEO, "As noted in my earlier email, the Division has been actively engaging Center leadership as we attempt to resolve the challenging regulatory issues associated with our review of the Impella devices." Dr. Zuckerman continued, "…we [FDA] will need to review the data from the PROTECT-II trial per the agreed upon analyses outlined in the statistical analysis plan for [redacted] before we can finalize our review of [redacted]. Please note that any major supplemental analysis that are additionally performed should be considered post-hoc and indicated as such."

- On February 15, 2012, Carol Pekar, Director of Clinical and Regulatory Affairs at ABMD, wrote to Dr. Bram Zuckerman, Director of the FDA Division of Cardiovascular Devices, "Our [ABMD's] hope is that we can use the meeting to address any remaining concerns on the part of the FDA regarding the safety results of the [PROTECT-II] trial."

Yet, Defendants never disclosed the true purpose of this meeting (and did not disclose it at all until these FDA's disclosure of the meeting forced them to acknowledge it).

Moreover, Defendants never disclosed that FDA has safety concerns regarding Impella 2.5 as a result of Protect II.

99.    Thereafter, in April 2012, the Company received *another* letter from the FDA stating that its promotional materials continued to improperly market the Impella 2.5. The Company did not disclose this April 2012 letter until it announced, in its 2012 10-K filed with the SEC on June 4, 2012, that:

in April 2012, we received a follow up letter from the FDA stating that some of our promotional materials continued to market the Impella 2.5 in ways that are not compliant with FDA regulations. We are cooperating with the FDA in addressing its concerns.

100.     Further, although not disclosed until the end of the Class Period, during

the summer of 2012, the FDA conducted an audit of Abiomed for compliance issues and

Abiomed conducted its own internal audit.  CW5 stated that in August or September

2012 the Company "pulled the marketing and training materials," including promotional

materials on the web, from the field.  CW5 recalled that Howley and Andy Greenfield

(VP Healthcare Solutions) held conference calls with each region to give the order.  CW5

was part of the call for the Midwest region.  During the call, Howley said the marketing

and training materials are being "pulled for compliance reasons" and that "everything has

to be turned in for compliance reasons."  CW5 said, at the same time, "the Abiomed

Presentation Engine" ("APE") was taken down.   CW5 described the APE as an internal

training tool for sales and clinical representatives that is on the Abiomed internal website

and is only accessible by employees.   CW5 said the APE has "customer facing

materials" on it, meaning the uploads on the APE can be shown to customers.  CW5

further stated that after the materials were pulled, the field did not have any marketing or

training materials for several months.  CW1 stated that colleagues who were still at the

company at this time relayed that everything was pulled from the field during the summer

of 2012 for off-label and compliance issues.  CW5 further stated that once the staff was

re-issued marketing materials, the materials were extremely limited compared to what

they had previously.  Tellingly, CW5 specifically recalls that the materials no longer

included a slide regarding Impella 2.5 and cardiac power output and no longer included

the "Protect II slide deck."   Indeed, as Defendants admitted at the end of the Class Period,

Abiomed took "extensive actions to correct" its compliance issues, including its

marketing materials and "recertifi[cation of] the field team and management on our Impella labels."

101.     On September 10, 2012, Abiomed issued a press release announcing that it had received 510(k) clearance from the FDA for a new percutaneous, catheter-based Impella device providing peak flows of approximately four liters of blood per minute.  As the Company announced, "The increased flow is delivered on the same console platform, 9 French catheter, and introducer as the Impella 2.5 and will be marketed as the Impella CP™ (Cardiac Power) within the United States."  Moreover, like the Impella 2.5, the Impella CP (or Impella 2.5 Plus) is "intended for partial circulatory support using an extracorporeal bypass control unit, for periods up to 6 hours. It is also intended to be used to provide partial circulatory support (for periods up to 6 hours) during procedures not requiring cardiopulmonary bypass."

102.     The FDA clearance letter dated September 6, 2012, specifically added safety limitations on Impella CP usage and mandatory safety labeling.  The FDA's September 6, 2012 letter states:

> The Office of Device Evaluation has determined that there is reasonable  likelihood that this device  will  be used for an intended  use not identified in the proposed labeling and that such use could cause harm. Therefore, in  accordance  with Section 513(i)(l)(E) of the Act, the following limitation  must  appear in the Warnings section of the] device's labeling:
>
> The safety and effectiveness of this device **has not been established** for use in providing partial or full support of the blood circulation for periods of greater than 6 hours, or for providing prophylactic hemodynamic support, for example, in patients with stable hemodynamics during **percutaneous interventional procedures of high risk coronary artery lesions and/or anatomy.**

103.   The clearance from the FDA for the Impella CP was the based on the 2.5 as the predicate device.  Thus, safety and effectiveness concerns with the Impella CP

were equally applicable to the Impella 2.5 and, as noted above, in February 2012, the

safety of the Impella 2.5 was the subject of a meeting with the FDA.  Moreover, as the

Company admitted in an September 21, 2012 Form 8-K filing that "[t]he Impella CP and

Impella 2.5 are both 510(k) cleared for identical indications."  Thus, the FDA's limitation

on use and requirement of the additional Warning, highlight the FDA concerns with the

safety of the Impella, and demonstrate that Defendants knew that the FDA had ongoing

concerns about the safety and effectiveness of the Impella for high risk PCI.

**G.      DEFENDANTS' FALSE AND MISLEADING STATEMENTS**

104.     During the Class Period, the Defendants issued materially false and

misleading statements that deceived the investing public concerning, *inter alia*, the

Company's purported resolution of matters with the FDA, its marketing and promotion of

the Impella 2.5, its revenue and growth of Impella 2.5 sales, and its internal controls.

**1.      August 2011 Statements**

105.     On August 4, 2011, Abiomed issued a press release to announce its First

Quarter 2012 results for the period ended June 30, 2011 ("Q1 2012").  In the press

release, Abiomed said:

> Fiscal first quarter worldwide Impella revenue totaled $22.2 million, up 33%
> compared to revenue of $16.7 million during the same period of the prior year.
> U.S. Impella revenues of $20.5 million were up 31% from the prior year. Impella
> revenue from outside the U.S. totaled $1.7 million, up 70% from the prior year.

106.     Defendants' statements regarding Abiomed's reported revenue and

growth were false and misleading because they failed to disclose that the reported

revenue growth was substantially the result of off-label marketing as detailed in the

accounts provided by numerous former employees, as exhibited in the Company's

promotional materials discussed herein, and as evidence by the FDA's continued

scrutiny, safety concerns and admonishment of the Company during the Class Period.

These statements also were false and misleading as they failed to disclose that Abiomed's

continued revenue at such levels was at risk should the Company be forced to discontinue

these practices, especially in light of the FDA's continued scrutiny, safety concerns and

admonishment of the Company during the Class Period.

107.    On August 4, 2011, Abiomed also held a conference call with analysts to

discuss their Q1 2012 results.  During the conference call, Defendant Minogue

improperly promoted the failed Protect II and Abiomed's claims regarding the results,

stating that:

> In regard to high-risk PCI, the PROTECT II study is the first-ever FDA study for
> high-risk PCI requiring hemodynamic support and first intra-aortic balloon pump
> FDA study overall. To summarize PROTECT II, the Impella patients were treated
> more aggressively and ***had significantly better outcomes at 90 days***.[3]

108.    Defendant Minogue's statements were materially false and misleading

when made because they improperly included claims based on its post-hoc analysis

regarding the Protect II study, improperly compared the Impella 2.5 to the IABP,

improperly promoted the Impella 2.5 for high-risk PCI for which it is not cleared, failed

to disclose the FDA's safety concerns with the devise related to the Protect II study, and

constituted improper marketing of the Impella 2.5 for the same reasons detailed in the

FDA's letters to Abiomed and in violation of FDA regulations and Abiomed's stated

policy to refrain from off-label promotion of its products.

---

[3] All emphasis added unless otherwise noted.

109.    Further, during the call, Defendant Minogue announced revenue results

for Q1 2012 "with 25% growth in overall revenue of $27.4 million led by 33% growth in

Impella revenue and impressive gross margins of 78%."

110.    During the call, Defendant Bowen also commented on Impella revenue:

[W]e posted another strong quarter of revenue growth, up 25% from last year,
which was above our 20% to 24% guided range for the year. The growth was
driven by continued adoption and utilization of the Impella platform and includes
strong growth in both the U.S. and Europe. . .

I would note that the Impella revenues and service revenues have both
demonstrated very strong growth for several quarters and represented 87% of total
revenue in the most recent quarter. . .

Turning to guidance, full year revenue guidance for fiscal 2012, as noted in our
press release, is in the range of $120 million to $125 million, representing a
growth rate of 20% to 24%. Impella revenues grew 33% in the first fiscal quarter,
the midpoint of the range we guided on the last conference call of 30% to 35% for
the year. All other revenues were 2% lower compared to the guided range last
quarter of a decline of approximately 25% for the year. As noted on our last
earnings call, we expect the positive effects of the PROTECT II clinical story to
materialize in the second half of fiscal year 2012 as the clinical community digest
the outcome and economic benefits. As such we believe the quarterly revenue
profile will be similar to what we experienced in fiscal 2011 with approximately
45% of annual revenue in the first half and 55% in the second half. Historically,
fiscal Q2 is a slow quarter. However, our current plans call for sequentially flat to
slightly higher revenues driven by the Impella 2.5 in the U.S., partially offset by
lower revenues in Europe where we do expect to see a summer slowdown.

111.    Defendant Minogue's and Defendant Bowen's statements in the

preceding two paragraphs regarding Abiomed's reported revenue and growth were false

and misleading because they failed to disclose that the reported revenue growth was

substantially the result of off-label marketing as detailed in the accounts provided by

numerous former employees, as exhibited in the Company's promotional materials

discussed herein, and as evidence by the FDA's continued scrutiny, safety concerns and

admonishment of the Company during the Class Period.   These statements also were

false and misleading as they failed to disclose that Abiomed's continued revenue and

growth at such levels was at risk should they be forced to discontinue these practices,

especially in light of the FDA's continued scrutiny, safety concerns and admonishment of

the Company during the Class Period.

112.    During the Q&A session of the call, analyst Thomas Gundersun of Piper

Jaffray asked for an update on the 2011 FDA Warning Letter, which had been sent to

Abiomed on June 10, 2011.  Defendant Minogue answered:

> . . . [O]n the FDA, we've been working with them and after a thoughtful
> consideration on their part, we will be maintaining our mission statement and our
> motto of recovering hearts and saving lives; that's at the root of what we do, and
> it's also on how we design our products and it's one of the things that really
> makes us unique as a company.  Nothing in the warning letter had anything to do
> with the patient safety or patient outcomes or any of the things we're doing in the
> field to support our customer base, but we'll continue to be vigilant on how we
> work with them, and as you know, we've always had a strong relationship with
> them and have multiple products in submission or in post-market registries.

113.    Defendant Minogue's statements regarding that warning letter and

Abiomed addressing the FDA's concerns were false and misleading because Abiomed

engaged in widespread management-directed off-label marketing and promotion of the

Impella 2.5, including in the field with customers, and was not properly addressing the

FDA's issues, including those related to the FDA's safety concerns regarding the Protect

II study, as detailed in the accounts provided by numerous former employees, as

exhibited in the Company's promotional materials discussed herein, and as evidence by

the FDA's continued scrutiny, safety concerns and admonishment of the Company during

the Class Period.

114.    On August 5, 2011, Abiomed filed its 10-Q for Q1 2012 with the SEC.

In the 10-Q for Q1 2012 Abiomed continued to improperly compare the Impella 2.5 to

the IABP (in the very same document in which it states the FDA's concerns have been

resolved), despite the FDA's admonishment for this comparison in the 2011 FDA

Warning Letter.  Specifically, in regard to the PROTECT II study, Abiomed said:

> In April 2011, we announced final results from the Protect II study, including
> those patients enrolled following the initiation of the interim analysis, which
> ***showed a statistically significant 21% reduction in major adverse events
> compared to the IAB at 90 days per protocol***.

115.    Defendant Minogue's statements were materially false and misleading

when made because they improperly included claims based on its post-hoc analysis of the

Protect II study, improperly compared the Impella 2.5 to the IABP, improperly promoted

the Impella 2.5 for high-risk PCI for which it is not cleared, failed to disclose the FDA's

safety concerns with the devise related to the Protect II study, and constituted improper

marketing of the Impella 2.5 for the same reasons detailed in the FDA's letters to

Abiomed and in violation of FDA regulations and Abiomed's stated policy to refrain

from off-label promotion of its products.

116.    Further, in its 10-Q for Q1 2012, Abiomed sought to reassure its

shareholders that the issues raised by the FDA were resolved and that its policy was to

refrain from off-label marketing:

> ***Although our policy is to refrain from statements that could be considered off-
> label promotion of our products***, the FDA or another regulatory agency could
> disagree and conclude that we have engaged in off-label promotion.  In June
> 2011, we received a warning letter from the FDA stating that some of our
> promotional materials marketed the Impella 2.5 for uses that had not been
> approved by the FDA. ***We have cooperated with the FDA in addressing its
> concerns and believe that we have resolved the matter without any penalties.
> Although we believe that this issue has been resolved***, if similar matters come up
> in the future, we may not be able to resolve them without facing significant
> consequences.

117.    Defendants' statements that Abiomed's policy was to refrain from off-label promotion and Defendants' statements regarding Abiomed addressing the FDA's concerns and resolving the FDA's issues were false and misleading because Abiomed engaged in widespread management-directed off-label marketing and promotion of the Impella 2.5 and had not resolved the FDA's issues, including those related to the FDA's safety concerns regarding the Protect II study, as detailed in the accounts provided by numerous former employees, as exhibited in the Company's promotional materials discussed herein, and as evidence by the FDA's continued scrutiny, safety concerns, and admonishment of the Company during the Class Period.

118.    In the 10-Q, Defendants also announced revenue results for Q1 2012:

Total revenues for the three months ended June 30, 2011 increased by $5.4 million, or 25%, to $27.4 million from $22.0 million for the three months ended June 30, 2010. The increase in total revenue was primarily due to higher Impella orders due to greater demand in the U.S.

Impella revenues for the three months ended June 30, 2011 increased by $5.5 million, or 33% to $22.2 million from $16.7 million for the three months ended June 30, 2010. Most of our Impella revenue was from disposable product sales of Impella in the U.S., as we focus on increasing utilization of these products through continued sales force and physician training.

119.    Defendants' statements regarding Abiomed's reported revenue and growth were false and misleading because they failed to disclose that the reported revenue growth was substantially the result of off-label marketing as detailed in the accounts provided by numerous former employees, as exhibited in the Company's promotional materials discussed herein, and as evidence by the FDA's continued scrutiny, safety concerns and admonishment of the Company during the Class Period. These statements also were false and misleading as they failed to disclose that Abiomed's continued revenue at such levels was at risk should they be forced to discontinue these

46

practices, especially in light of the FDA's continued scrutiny, safety concerns and

admonishment of the Company during the Class Period.

### 2.    November 2011 Statements

120.    On November 3, 2011 Abiomed issued a press release announcing its

Second Quarter 2012 results for the period ended June 30, 2011 ("Q2 2012"):

- Fiscal second quarter worldwide Impella revenue totaled $24.8 million, up 40% compared to revenue of $17.7 million during the same period of the prior year. U.S. Impella revenues of $23.1 million were up 41% from the prior year.

- Total U.S. revenues of $27.3 million were up 25% from $21.8 million in the prior year. Revenue from outside the U.S. totaled $2.2 million, up 38% from $1.6 million in the prior year.

- In alignment with the Company's strategy to open fewer sites and drive deeper utilization at existing customer sites, an additional 22 U.S. hospitals purchased Impella 2.5 during the quarter, as compared to 27 hospitals added in the second quarter of fiscal 2011, bringing the total to 568 customer sites.

121.    Also on November 3, 2011, Abiomed hosted a conference call to discuss

Q2 2012 earnings and results.  On the call, Defendant Minogue also announced revenue

results for Q2 2012:

> We are proud to report the best quarter in Company history with 26% growth in total revenue at $29.5 million and 40% growth in Impella revenue driven by record patients supported. These results are especially impressive in light of the summer season slowdown and that we have not yet presented at TCT. Additional best ever Company results are also reported this quarter on Impella revenue, Impella reorder revenue, GAAP and non-GAAP net income and gross margin. I thank and congratulate the entire team for the results.

122.    During the call, Defendant Bowen also discussed Impella revenue and

growth:

> [W]e posted another strong quarter of revenue growth, up 26% from last year to $29.5 million, which for the second quarter in a row, was above our 20% to 24% guided range for the year and included strong growth in both the U.S. up 25% to

$27.3 million and outside the U.S. up 38% to $2.2 million.  Worldwide Impella revenues totaled $24.8 million, up 40% from the prior year, largely driven by increased Impella 2.5 utilization in the cath lab.

Gross margin for the quarter was also strong at 81.2%, compared to 76.9% in the year ago period and above our guided range of 78% to 80%. The improvement was primarily due to a higher portion of revenues from Impella disposables, higher unit production volumes which leveraged the fixed portion of our manufacturing costs and favorable yields. . .

Turning to guidance, full year revenue guidance of fiscal year 2012 as noted in our press release continues to be in the range of $120 million to $125 million, representing a growth rate of 20% to 24%. Year-to-date Impella revenue is up 37% compared to the Impella arrange we guided to since the outset of the year of 30% to 35%. All other avenues were 11% lower on a year-to-date basis compared to our guided range of a decline of approximately 25% lower for the year. We believe the new Impella clinical and cost-effectiveness data to be presented at TCT next week will act as an additional catalyst for Impella growth.

123.     Defendants' statements in the three preceding paragraphs regarding Abiomed's reported revenue and growth were false and misleading because they failed to disclose that the reported revenue growth was substantially the result of off-label marketing as detailed in the accounts provided by numerous former employees, as exhibited in the Company's promotional materials discussed herein, and as evidence by the FDA's continued scrutiny, safety concerns and admonishment of the Company during the Class Period.   These statements also were false and misleading as they failed to disclose that Abiomed's continued revenue and growth at such levels was at risk should they be forced to discontinue these practices, especially in light of the FDA's continued scrutiny, safety concerns and admonishment of the Company during the Class Period.

124.     During the Q&A session of the call, Defendant Minogue continued the false and misleading statements concerning resolving issues with the FDA after analyst Anthony Petrone from Jeffries asked for an update on the 2011 FDA Warning Letter:

On the warning letter, I believe **we've resolved the issues and taken the feedback from the FDA and are working that into our operating mechanism**.

125.     Defendant Minogue's statements regarding Abiomed addressing the

FDA's concerns and resolving the FDA's issues were false and misleading because

Abiomed engaged in widespread management-directed off-label marketing and

promotion of the Impella 2.5 and had not resolved the FDA's issues or worked the FDA's

feedback into Abiomed's operating mechanism, including those related to the FDA's

safety concerns regarding the Protect II study, as detailed in the accounts provided by

numerous former employees, as exhibited in the Company's promotional materials

discussed herein, and as evidence by the FDA's continued scrutiny, safety concerns, and

admonishment of the Company during the Class Period.

126.     On November 7, 2011, Abiomed filed its 10-Q for Q2 2012, Defendants

continued to improperly compare the Impella 2.5 to the IABP in defiance of the 2011

FDA Warning Letter with comments substantially similar to those in its10-Q for Q1

2012:

> In December 2010, we announced the termination of the Protect II study based on a futility determination at the planned interim analysis regarding the primary end-point, which we view as likely to have resulted from how rotational athorectomy was used in the study. In April 2011, we announced the final results from the Protect II study, including those patients enrolled following the initiation of the interim analysis, **which showed a statistically significant 21% reduction in major adverse events compared to the intra aortic balloon at 90 days per protocol.**

127.     Defendants' statements were materially false and misleading when made

because they improperly included claims based on its post-hoc analysis of the Protect II

study, improperly compared the Impella 2.5 to the IABP, improperly promoted the

Impella 2.5 for high-risk PCI for which it is not cleared, failed to disclose the FDA's

safety concerns with the devise related to the Protect II study, and constituted improper

marketing of the Impella 2.5 for the same reasons detailed in the FDA's letters to

Abiomed and in violation of FDA regulations and Abiomed's stated policy to refrain

from off-label promotion of its products.

128.     In the 10-Q for Q2 2012, Abiomed also addressed the 2011 FDA

Warning Letter with the exact same comments as those in its Q1 2012 10-Q:

> ***Although our policy is to refrain from statements that could be considered off-label promotion of our products***, the FDA or another regulatory agency could disagree and conclude that we have engaged in off-label promotion. In June 2011, we received a warning letter from the FDA stating that some of our promotional materials marketed the Impella 2.5 for uses that had not been approved by the FDA. ***We have cooperated with the FDA in addressing its concerns and believe that we have resolved the matter without any penalties. Although we believe that this issue has been resolved***, if similar matters come up in the future, we may not be able to resolve them without facing significant consequences.

129.     Defendants' statements that Abiomed's policy was to refrain from off-

label promotion and Defendants' statements regarding Abiomed addressing the FDA's

concerns and resolving the FDA's issues were false and misleading because Abiomed

engaged in widespread management-directed off-label marketing and promotion of the

Impella 2.5 and had not resolved the FDA's issues, including those related to the FDA's

safety concerns regarding the Protect II study, as detailed in the accounts provided by

numerous former employees, as exhibited in the Company's promotional materials

discussed herein, and as evidence by the FDA's continued scrutiny, safety concerns, and

admonishment of the Company during the Class Period.

130.     In its 10-Q for Q2 2012, Abiomed again announced its revenue from

Impella 2.5 sales for the quarter:

> Total revenues for the three months ended September 30, 2011 increased by $6.1 million, or 26%, to $29.5 million from $23.4 million for the three months ended

September 30, 2010.  The increase in total revenue was primarily due to higher Impella orders due to greater demand in the U.S.  Total revenues for the six months ended September 30, 2011 increased by $11.4 million, or 25%, to $56.8 million from $45.4 million for the six months ended September 30, 2010. ***The increase in total revenue was primarily due to higher Impella orders due to greater demand in the U.S.***

Impella product revenues for the three months ended September 30, 2011 increased by $7.1 million, or 40% to $24.8 million from $17.7 million for the three months ended September 30, 2010.  Impella revenues for the six months ended September 30, 2011 increased by $12.6 million, or 37% to $47.0 million from $34.4 million for the six months ended September 30, 2010.  Most of our ***Impella revenue was from disposable product sales of Impella in the U.S., as we focus on increasing utilization of these products through continued investment in our sales force and physician training***.

131.    The 10-Q for Q2 2012 also stated:

***Our strategic focus and the driver of the most recent revenue growth in our business is the market penetration of our Impella 2.5 product, which received 510(k) clearance in June 2008 for partial circulatory support for up to six hours***.

132.    Defendants' statements regarding Abiomed's reported revenue and

growth, the focus and drivers of such revenue and reasons for such growth and demand,

including the investment in Abiomed's sales force, were false and misleading because

they failed to disclose that the reported revenue growth was substantially the result of off-

label marketing as detailed in the accounts provided by numerous former employees, as

exhibited in the Company's promotional materials discussed herein, and as evidence by

the FDA's continued scrutiny, safety concerns and admonishment of the Company during

the Class Period.   These statements also were false and misleading as they failed to

disclose that Abiomed's continued revenue at such levels was at risk should they be

forced to discontinue these practices, especially in light of the FDA's continued scrutiny,

safety concerns and admonishment of the Company during the Class Period.

### 3.     February 2012 Statements

133.     On February 3, 2012, Abiomed issued a press release announcing its Third Quarter 2012 results for the period ended December 31, 2011 ("Q3 2012").  In the press release, Abiomed continued to improperly compare the Impella 2.5 to the IABP:

> Additional Protect II clinical analyses were presented at TCT 2011, which **_demonstrated that patients undergoing extensive revascularization showed the most clinical benefit in the Impella arm to 90 days_**.

134.     Defendant's statements were materially false and misleading when made because they improperly included claims based on its post-hoc analysis of the Protect II study, improperly compared the Impella 2.5 to the IABP, improperly promoted the Impella 2.5 for high-risk PCI for which it is not cleared, failed to disclose the FDA's safety concerns with the devise related to the Protect II study, and constituted improper marketing of the Impella 2.5 for the same reasons detailed in the FDA's letters to Abiomed and in violation of FDA regulations and Abiomed's stated policy to refrain from off-label promotion of its products.

135.     The press release also announced Abiomed's revenue, growth and guidance:

- Fiscal third quarter worldwide Impella® revenue totaled $27.7 million, up 31% compared to revenue of $21.2 million during the same period of the prior year. U.S. Impella revenue of $25.5 million was up 30% from the prior year.

- Total U.S. revenue of $29.6 million was up 17% from $25.3 million in the prior year. Revenue from outside the U.S. totaled $2.6 million, up 37% from $1.9 million in the prior year.

- An additional 37 U.S. hospitals purchased Impella 2.5 during the quarter. There are now 605 Impella U.S. customer sites.

136.     Defendants' statements regarding Abiomed's reported revenue and growth were false and misleading because they failed to disclose that the reported revenue growth was substantially the result of off-label marketing as detailed in the accounts provided by numerous former employees, as exhibited in the Company's promotional materials discussed herein, and as evidence by the FDA's continued scrutiny, safety concerns and admonishment of the Company during the Class Period. These statements also were false and misleading as they failed to disclose that Abiomed's continued revenue at such levels was at risk should they be forced to discontinue these practices, especially in light of the FDA's continued scrutiny, safety concerns and admonishment of the Company during the Class Period.

137.     On February 3, 2012, Abiomed also hosted a conference call to discuss earnings and results for Q3 2012.  On the call, Defendant Minogue continued to improperly compare the Impella 2.5 to the IABP in defiance of the FDA warning letter:

> *In PROTECT II, the economic study revealed that the Impella patients had lower hospital charges at 90 days, driven by 47% reduction in repeat revascularization and 67% lower charges per readmission as compared to the intra-aortic balloon pump.*

138.     Defendant Minogue's statements were materially false and misleading when made because they improperly included claims based on its post-hoc analysis of the Protect II study, improperly compared the Impella 2.5 to the IABP, improperly promoted the Impella 2.5 for high-risk PCI for which it is not cleared, failed to disclose the FDA's safety concerns with the devise related to the Protect II study, and constituted improper marketing of the Impella 2.5 for the same reasons detailed in the FDA's letters to Abiomed and in violation of FDA regulations and Abiomed's stated policy to refrain from off-label promotion of its products.

53

139.   On the call, Defendant Minogue again announced revenue results for Q3 2012 and Impella 2.5 usage breakdowns:

> We are again proud to report the best quarter in Company history with 18% growth in total revenue at $32.2 million and 31% growth in Impella revenue. We continue to grow sequentially and year-over-year in both revenue and patients supported.  Best ever Company results are also reported this quarter on Impella revenue, Impella reorder revenue, total patients supported, GAAP and non-GAAP net income and cash generation. . .

> With Impella now at an annual run rate of over $100 million and growing greater than 30%, we believe Abiomed is just in the early innings of our potential market and look forward to the future.

140.   During the call, Defendant Bowen also commented on Impella revenue, stating, "[W]orldwide Impella revenue totaled $27.7 million, up 31% from the prior year."

141.   Defendant Minogue's and Defendant Bowen's statements in the two preceding paragraphs regarding Abiomed's reported revenue and growth were false and misleading because they failed to disclose that the reported revenue growth was substantially the result of off-label marketing as detailed in the accounts provided by numerous former employees, as exhibited in the Company's promotional materials discussed herein, and as evidence by the FDA's continued scrutiny, safety concerns and admonishment of the Company during the Class Period.   These statements also were false and misleading as they failed to disclose that Abiomed's continued revenue at such levels was at risk should they be forced to discontinue these practices, especially in light of the FDA's continued scrutiny, safety concerns and admonishment of the Company during the Class Period.

142.     On February 7, 2012, Defendant Minogue appeared on CNBC's "Mad Money" and engaged in off-label discussions regarding the Impella (both the Impella 2.5 and the Impella 5.0 as noted above).  Minogue stated:

> Payers and providers want to find ways to get better outcomes, not just at the hospital **but out [at] 90 days and in our studies we show a 56% reduction in adverse events when they leave the hospital to 90 days**…
>
> So this is the world's smallest heart pump.  It can be put through a small hole in the leg to get to the heart.  Procedures today patients are riskier, sicker and their getting, the procedures are less invasive.  So you can put this pump in within minutes through a small hole in the leg.  It will sit in the left ventricle, it will pump 2.5 to 5 liters of flow.  This little pump.  So here's the motor, and this is the world's smallest heart pump, right in this key chain.  This is spinning at 50,000 revolutions per minute.  And this helps the heart rest and recover or provide protection.  So there's two types of patients.  ***There's the patient that has a bad heart and they want to go through a minimal evasive procedure or their turned down for surgery.  So Bob Ballou in Texas is in hospice, surgeons are turning him down.  Intervention cardiologist, who's committed to trying to improve this patient's outcomes, put the Impella in, puts it in, does a procedure.  The patient, as we see in our studies, their heart gets better they improve.  And on the emergency patients, we have folks like Mike Lenny, who's a firefighter that has a massive heart attack, arrives at the hospital getting CPR.  They use the pump to help rest his heart and he gets better, he's back now with his own heart.  He didn't have to have surgery, he didn't have to get a ICD, he didn't have to get a transplant.  So this is what we are focused on.  Again heart recovery is very special***…
>
> And we also have a lot of clinical data coming*.  **And this [holds up n IABP] is a 124,000 times a year, this [holds up an Impella] is about 4,000 today, so we are still in the early innings of our ramp** . . . **And it's cost effective.***  And patients get to keep their own heart.

143.     Defendant Minogue's statements were materially false and misleading when made because they improperly included claims based on its post-hoc analysis of the Protect II study, improperly compared the Impella to the IABP, improperly promoted the Impella for high-risk PCI for which it is not cleared, failed to disclose the FDA's safety concerns with the devise related to the Protect II study, and constituted improper marketing of the Impella for the same reasons detailed in the FDA's letters to Abiomed

and in violation of FDA regulations and Abiomed's stated policy to refrain from off-label

promotion of its products.

144.    On February 8, 2012, Abiomed filed its 10-Q for Q3 2012.  In the 10-Q

for Q3 2012, Abiomed again addressed the 2011 FDA Warning Letter with the exact

same comments as those in its Q1 and Q2 2012 10-Qs:

> *Although our policy is to refrain from statements that could be considered off-label promotion of our products*, the FDA or another regulatory agency could disagree and conclude that we have engaged in off-label promotion. In June 2011, we received a warning letter from the FDA stating that some of our promotional materials marketed the Impella 2.5 for uses that had not been approved by the FDA.  *We have cooperated with the FDA in addressing its concerns and believe that we have resolved the matter without any penalties.  Although we believe that this issue has been resolved*, if similar matters come up in the future, we may not be able to resolve them without facing significant consequences.

145.    Defendants' statements that Abiomed's policy was to refrain from off-

label promotion and Defendants' statements regarding Abiomed addressing the FDA's

concerns and resolving the FDA's issues were false and misleading because Abiomed

engaged in widespread management-directed off-label marketing and promotion of the

Impella 2.5 and had not resolved the FDA's issues, including those related to the FDA's

safety concerns regarding the Protect II study, as detailed in the accounts provided by

numerous former employees, as exhibited in the Company's promotional materials

discussed herein, and as evidence by the FDA's continued scrutiny, safety concerns, and

admonishment of the Company during the Class Period.

146.    Also in the 10-Q for Q3 2012, Abiomed again announced its revenue

from Impella 2.5 sales for the quarter:

> Total revenues for the three months ended December 31, 2011 increased by $5.0 million, or 18%, to $32.2 million from $27.2 million for the three months ended December 31, 2010.  *The increase in total revenue was primarily due to higher*

*Impella revenue due to greater utilization in the U.S. Total revenues for the nine months ended December 31, 2011 increased by $16.4 million, or 23%, to $89.0 million from $72.6 million for the nine months ended December 31, 2010. The increase in total revenue was primarily due to higher Impella revenue from greater utilization in the U.S.*

Impella product revenues for the three months ended December 31, 2011 increased by $6.5 million, or 31% to $27.7 million from $21.2 million for the three months ended December 31, 2010. Impella revenues for the nine months ended December 31, 2011 increased by $19.0 million, or 34% to $74.7 million from $55.7 million for the nine months ended December 31, 2010. *Most of our Impella revenue was from disposable product sales of Impella in the U.S., as we focus on increasing utilization of these products through continued investment in our sales force and physician training*.

147.    Defendants' statements regarding Abiomed's reported revenue and growth and the reasons for such growth, including the investment in Abiomed's sales force, were false and misleading because they failed to disclose that the reported revenue growth was substantially the result of off-label marketing as detailed in the accounts provided by numerous former employees, as exhibited in the Company's promotional materials discussed herein, and as evidence by the FDA's continued scrutiny, safety concerns and admonishment of the Company during the Class Period.   These statements also were false and misleading as they failed to disclose that Abiomed's continued revenue at such levels was at risk should they be forced to discontinue these practices, especially in light of the FDA's continued scrutiny, safety concerns and admonishment of the Company during the Class Period.

### 4.    May/June 2012 Statements

148.    On May 16, 2012, Abiomed issued a press release announcing results for its Fourth Quarter 2012 for the period ended March 31, 2012 ("Q4 2012") and the full fiscal 2012 year (ended March 31, 2012):

- Fiscal fourth quarter worldwide Impella revenue totaled $32.3 million, up 43% compared to revenue of $22.6 million during the same period of the prior year.  U.S. Impella revenue grew 44% to $29.9 million.

- Full year worldwide Impella revenue totaled $106.9 million, up 37% compared to revenue of $78.2 million during the same period of the prior year.  U.S. Impella revenue grew 37% to $99.1 million.

- As targeted, an additional 26 hospitals purchased Impella 2.5 during the quarter, bringing the total to 631 customer sites.

149.    On May 16, 2012, Abiomed also hosted a conference call to discuss its revenue from Impella 2.5 sales for Q4 2012 and the full fiscal 2012.  On the call, Defendant Minogue announced revenue results:

We are happy to report the best quarter in Company history with 31% growth in total revenue at $37.3 million and 43% growth in Impella revenue.  We believe our revenue ramp indicates Impella is poised to become the new standard-of-care for percutaneous circulatory support with established CMS DRG reimbursement, Impella guideline inclusion and pending dedicated CPT codes. . .

The company closed strong in Q4, exceeded our yearly revenue guidance, thus establishing Abiomed as one of the fastest growing profitable medical device companies.  *For the full fiscal year the company achieved GAAP profitability at $126 million in revenue and demonstrated the leverage of our business model.*  Impella is now at an annual run rate of well over $100 million and grew greater than 30% year-over-year for the tenth straight quarter.

150.    During the call, Defendant Bowen also commented on Impella revenue and growth:

Overall, fiscal fourth quarter revenue was up 31% from last year to $37.3 million as a result of strong growth and the utilization of Impella. For the full fiscal year revenue grew 25% to $126.4 million from $101.2 million in the prior year. Worldwide Impella revenue totaled $32.3 million, up 43% from $22.6 million in the prior year, which is the highest Impella growth rate in the past eight quarters. For the full fiscal year, worldwide Impella grew 37% to $106.9 million from $78.2 million in the prior year.

151.    Defendants' statements in the three preceding paragraphs regarding Abiomed's reported revenue and growth and that at demonstrated the leverage of

Abiomed's business model were false and misleading because they failed to disclose that

the reported revenue growth was substantially the result of off-label marketing, which

was essentially Abiomed's business model, as detailed in the accounts provided by

numerous former employees, as exhibited in the Company's promotional materials

discussed herein, and as evidence by the FDA's continued scrutiny, safety concerns and

admonishment of the Company during the Class Period.   These statements also were

false and misleading as they failed to disclose that Abiomed's continued revenue at such

levels was at risk should they be forced to discontinue these practices, especially in light

of the FDA's continued scrutiny, safety concerns and admonishment of the Company

during the Class Period.

> 152.     On May 22, 2012, Abiomed was forced to discuss the February 24, 2012

meeting with the FDA as a result of investors finding reference to in on the FDA's

website.  Misrepresenting the real reason for the meeting, Abiomed stated in a Form 8-K

filed that day:

> Abiomed is filing this 8-K to clarify two meetings held between
> FDA and Abiomed on February 24, 2012.
>
> A morning meeting was held with the FDA reviewers to present
> the final results of the PROTECT II study as part of the process to
> close out the IDE (Investigational Device Exemption). Included in
> Abiomed's presentation at this meeting were the 30- and 90-day
> results. The results presented were consistent with those previously
> disclosed by the Company and originally submitted to the FDA in
> December 2010. Sub-group analysis was also discussed, including
> the atherectomy subgroup that was a confounding factor for the
> PROTECT II trial, as previously disclosed by Abiomed. As
> reported by Abiomed, vigorous use of atherectomy in the Impella
> arm led to cardiac enzyme release that qualified in PROTECT II as
> an MI (myocardial infarction) given the PROTECT II definition of
> MI as CK-MB > 3x ULN (Upper Limit of Normal).
>
> Abiomed had also requested that some of the meeting time be
> utilized for an update to the Impella cVAD 510(k) submission. In

> this context, safety aspects of the technology have to be reviewed
> with the FDA as a standard part of the 510(k) process.
>
> In a separate afternoon meeting, which was disclosed on the FDA
> website and held at the request of Abiomed's CEO with Dr. Shuren
> and his team, the following specific topics were discussed:
> Registry - Post-Market Surveillance, Clinical Indications/Labeling,
> Pediatric/HDE Suggestions for Improvement, the 510(k) Process,
> and Smaller Company Concerns & Recommendations for
> Improvement. Abiomed's CEO is Chair of AdvaMed's Emerging
> Growth Companies Committee

153.    Defendants' statements regarding the meeting were false and misleading

as they failed to disclose that a purpose of the meeting was to discuss Abiomed's

improper marketing of the Impella 2.5, including claims based on its post-hoc analysis of

the Protect II study, and the FDA's safety concerns with the device related to the Protect

II study.

154.    On June 4, 2012 Abiomed filed its Form 10-K for the fiscal year ended

March 31, 2012 ("2012 10-K") with the SEC.  Although Abiomed revealed additional

correspondence from the FDA with regard to its marketing of the Impella 2.5, the

Company once again downplayed the correspondence and attempted to create the

impression that the Company was cooperating and the matter was not an issue:

> ***Although our policy is to refrain from statements that could be considered
> off-label promotion of our products,*** the FDA or another regulatory agency
> could disagree and conclude that we have engaged in off-label promotion. In
> June 2011 we received a warning letter from the FDA stating that some of our
> promotional materials marketed the Impella 2.5 for uses that had not been
> approved by the FDA. ***We cooperated with the FDA and made changes to
> our promotional materials in response to the warning letter.*** However, in
> April 2012, we received a follow up letter from the FDA stating that some of
> our promotional materials continued to market the Impella 2.5 in ways that are
> not compliant with FDA regulations. ***We are cooperating with the FDA in
> addressing its concerns.***  While we hope to be able to resolve this matter
> without incurring penalties, we may not be able to resolve it, or any similar
> matters that may come up in the future without facing significant
> consequences.  Such matters could result in reduced demand for our products
> and would have a material adverse effect on our operations and prospects.

155.    Defendants' statements that Abiomed's policy was to refrain from off-label promotion and Defendants' statements that Abiomed was addressing the FDA's concerns were false and misleading because Abiomed engaged in widespread management-directed off-label marketing and promotion of the Impella 2.5 and had not resolved the FDA's issues, including those related to the FDA's safety concerns regarding the Protect II study, as detailed in the accounts provided by numerous former employees, as exhibited in the Company's promotional materials discussed herein, and as evidence by the FDA's continued scrutiny, safety concerns, and admonishment of the Company during the Class Period.

156.    The 2012 10-K also continued to improperly tout the Protect II study:

> In November 2011, we announced additional analysis of the results from the Protect II study, including those patients enrolled following the initiation of the interim analysis, *which showed a statistically significant 22% relative reduction in major adverse events compared to the IAB at 90 days per protocol (p=0.023), a 52% relative reduction in repeat revascularization (p=0.024) and a 56% relative reduction in material adverse events post hospital discharge (p=0.002). Furthermore, additional data analysis of the clinical data from the Protect II trial revealed that more aggressive revascularization is beneficial for patients with coronary artery disease and reduced left ventricular function*.

157.    Defendants' statements were materially false and misleading when made because they improperly included claims based on its post-hoc analysis of the Protect II study, improperly compared the Impella 2.5 to the IABP, improperly promoted the Impella 2.5 for high-risk PCI, failed to disclose the FDA's safety concerns with the devise related to the Protect II study, and constituted improper marketing of the Impella 2.5 for the same reasons detailed in the FDA's letters to Abiomed and in violation of

FDA regulations and Abiomed's stated policy to refrain from off-label promotion of its products.

158.     The 2012 10-K also contained the following revenue and growth statements for the Impella 2.5:

> Total revenues for fiscal 2012 increased by $25.2 million, or 25%, to $126.4 million from $101.2 million for fiscal 2011.  The increase in total revenue was primarily due to higher Impella revenue due to greater utilization in the U.S.

> Impella product revenues for fiscal 2012 increased by $28.7 million, or 37%, to $106.9 million from $78.2 million for fiscal 2011.  ***Most of our Impella revenue was from disposable product sales of Impella 2.5 in the U.S., as we focus on controlled rollouts for new sites and increasing utilization of these products through continued investment in our sales force and physician training***.

159.     Defendants' statements regarding Abiomed's reported revenue and growth and the reasons for such growth, including the investment in Abiomed's sales force, were false and misleading because they failed to disclose that the reported revenue growth was substantially the result of off-label marketing as detailed in the accounts provided by numerous former employees, as exhibited in the Company's promotional materials discussed herein, and as evidence by the FDA's continued scrutiny, safety concerns and admonishment of the Company during the Class Period.   These statements also were false and misleading as they failed to disclose that Abiomed's continued revenue at such levels was at risk should they be forced to discontinue these practices, especially in light of the FDA's continued scrutiny, safety concerns and admonishment of the Company during the Class Period.

**5.     August 2012 Statements**

160.     On August 2, 2012, Abiomed issued a press release announcing results for its First Quarter 2013 for the period ended June 30, 2012 ("Q1 2013"):

Fiscal first quarter worldwide Impella® revenue totaled $34.7 million, up 56% compared to revenue of $22.2 million during the same period of the prior year. U.S. Impella revenue grew 61% to $33.0 million from $20.5 million in the prior year.

161.     Further in the press release, Defendant Minogue stated, "We are extremely pleased to report another quarter of record revenue, including acceleration in year-over-year Impella growth . . . 'We believe the Impella U.S. growth of 61% indicates Impella is becoming the new standard of care in the U.S. for percutaneous circulatory support.'"

162.     On August 2, 2012, Abiomed also hosted a conference call to discuss its Q1 2013 (the period ended June 30, 2012) earnings and revenues.  On the call, Defendant Minogue announced revenue results:

We are happy to report the best quarter in company history with 42% growth in total revenue at $38.8 million and 56% growth in Impella revenue.  We believe our sustained ramp and U.S. Impella growth of 61% indicates Impella is becoming the new standard of care in the U.S. for percutaneous circulatory support. . .

Impella is now at an annual run rate of approximately $140 million and has grown greater than 30% year-over-year for the 11th straight quarter. The company is off to a fast start this fiscal year, solidifying our position in the industry as one of the fastest growing profitable medical device company.

163.     During the call, Defendant Bowen also commented on Impella revenue:

As noted in our earnings release, fiscal first quarter revenue up $38.8 million was up 42% from last year, as a result of strong U.S. Impella revenue growth which was up 61% due to increased utilization. . .

Worldwide Impella revenue totaled $34.7 million, up 56% from $22.2 million in the prior year.  This was the highest year-over-year Impella quarterly growth rate in the past 10 quarters.

164.     Defendants' statements in the four preceding paragraphs regarding Abiomed's reported revenue and growth were false and misleading because they failed to

disclose that the reported revenue growth was substantially the result of off-label

marketing as detailed in the accounts provided by numerous former employees, as

exhibited in the Company's promotional materials discussed herein, and as evidence by

the FDA's continued scrutiny, safety concerns and admonishment of the Company during

the Class Period.   These statements also were false and misleading as they failed to

disclose that Abiomed's continued revenue at such levels was at risk should they be

forced to discontinue these practices, especially in light of the FDA's continued scrutiny,

safety concerns and admonishment of the Company during the Class Period.

165.     Further, as to the Protect II results, Defendant Minogue stated,

> **PROTECT II, in conjunction with the economic study revealed that the Impella arm at 90 days had a 56% reduction in major adverse events from discharge had half the rate of repeat revascularizations and had 67% less per readmissions in hospital charges**.

166.     Defendants' statements were materially false and misleading when made

because they improperly included claims based on its post-hoc analysis of the Protect II

study, improperly compared the Impella 2.5 to the IABP, improperly promoted the

Impella 2.5 for high-risk PCI for which it is not cleared, failed to disclose the FDA's

safety concerns with the devise related to the Protect II study, and constituted improper

marketing of the Impella 2.5 for the same reasons detailed in the FDA's letters to

Abiomed and in violation of FDA regulations and Abiomed's stated policy to refrain

from off-label promotion of its products.

167.     On August 6, 2012, Abiomed filed its 10-Q for Q1 2013 again

announcing Impella earnings and revenues:

> Total revenues for the three months ended June 30, 2012 increased by $11.4 million, or 42%, to $38.8 million from $27.4 million for the three months ended June 30, 2011.  **The increase in total revenue was primarily due to higher Impella revenue due to greater utilization in the U.S**.

Impella product revenues for the three months ended June 30, 2012 increased by $12.5 million, or 56%, to $34.7 million from $22.2 million for the three months ended June 30, 2011.  Most of our Impella revenue was from disposable product sales of Impella 2.5 in the U.S., *as we focus on controlled rollouts for new sites and increasing utilization of these products through continued investment in our sales force and physician training*.

168.    Defendants' statements regarding Abiomed's reported revenue and growth and the reasons for such growth, including the investment in Abiomed's sales force, were false and misleading because they failed to disclose that the reported revenue growth was substantially the result of off-label marketing as detailed in the accounts provided by numerous former employees, as exhibited in the Company's promotional materials discussed herein, and as evidence by the FDA's continued scrutiny, safety concerns and admonishment of the Company during the Class Period.   These statements also were false and misleading as they failed to disclose that Abiomed's continued revenue at such levels was at risk should they be forced to discontinue these practices, especially in light of the FDA's continued scrutiny, safety concerns and admonishment of the Company during the Class Period.

169.    Tellingly, in Abiomed's August 6, 2012 10-Q, Defendants no longer touted its claims regarding the Protect II study, that Abiomed's policy was to refrain from off-label promotion, and that Abiomed had addressed or resolved the FDA's concerns. Indeed, this was at the time the FDA audited Abiomed and Abiomed conducted its own internal audit.

**6.      September 2012 Statements**

170.    On September 10, 2012, Abiomed issued a press release announcing that it had received 510(k) clearance from the FDA for a new percutaneous, catheter-based

65

Impella device providing peak flows of approximately four liters of blood per minute.  As the Company announced, "The increased flow is delivered on the same console platform, 9 French catheter, and introducer as the Impella 2.5 and will be marketed as the Impella CP™ (Cardiac Power) within the United States."  Like the Impella 2.5, the Impella CP is "intended for partial circulatory support using an extracorporeal bypass control unit, for periods up to 6 hours. It is also intended to be used to provide partial circulatory support (for periods up to 6 hours) during procedures not requiring cardiopulmonary bypass." The press release stated that the clearance included a limitation in the Impella CP instructions for use, which read:  "The safety and effectiveness of this device has not been established for use in providing partial or full support of the blood circulation for periods of greater than six hours, or for providing prophylactic hemodynamic support, for example, in patients with stable hemodynamics during percutaneous interventional procedures of high risk coronary artery lesions and/or anatomy."

171.    Defendants' statements regarding the clearance of the Impella CP were false and misleading because they failed to disclose that the Company continued to market and promote the Impella without regard to the FDA's ongoing concerns, including the FDA's safety concerns with the devise related to the Protect II study.

**7.    Certifications and Internal Controls**

172.    The Q1 2012 10-Q also contained certifications of Defendants Minogue and Bowen, who certified:

1.  I have reviewed this Quarterly Report on Form 10-Q of ABIOMED, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under

which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a) Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

(b) Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

(c) Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

(d) Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting.

5. The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

> (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and
>
> (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

173.    Abiomed made identical representations in its all of the quarterly reports and the 10-K filed with the SEC during the Class Period.  The Form 10-K was also certified by Defendants Minogue and Bowen in accordance with the Sarbanes-Oxley Act of 2002.  By certifying that public filing Defendants Minogue and Bowen represented, *inter alia*, that "information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company."

174.    Given the internal control failures that resulted in widespread off-label marketing and promotion, that the Company's reports and financial statements did not fairly present in all material respects the financial condition, including the reliance on off-label marketing, and that the revenue and growth reported therein was the result of undisclosed, illicit and unsustainable off-label marketing, these certifications were false and misleading when made.

## H.    THE TRUTH IS REVEALED

175.    Prior to the opening of the stock market, in a November 1, 2012 press release, Abiomed revealed that the D.C. U.S. Attorney's Office had commenced an investigation into the Company's marketing and promotional practices regarding the Impella 2.5 catheter:

On October 26, 2012, Abiomed was informed that the United States
Attorney's Office for the District of Columbia is conducting an
investigation that is focused on the Company's marketing and labeling of
the Impella 2.5.  On October 31, 2012, Abiomed accepted service of a
Health Insurance Portability and Accountability Act administrative
subpoena related to this investigation.  The subpoena seeks documents
related to the Impella 2.5 and we understand the investigation focuses
primarily on marketing and labeling issues.  Abiomed is in the process of
responding to the subpoena and intends to cooperate fully.

As of the date of this complaint, the D.C. U.S. Attorney's office investigation

remains open.

176.    In the same press release, Abiomed also maintained its Impella revenue

guidance at approximately 30% for the fiscal year, despite 45% growth through the first

half of the year, implying a marked slowdown during the second half of the year:

The Company is maintaining its fiscal year 2013 revenue guidance in a
range of $155 million to $157 million, representing annual growth of 23%
to 24%, with worldwide Impella revenues forecast to grow greater than
30%.

177.    In its November 1, 2012 conference call to discuss Q2 2013 earnings,

Defendant Minogue admitted that the FDA audited the Company's marketing in the

summer of 2012, that Abiomed simultaneously conducted its own internal audit and that

Abiomed was required to take drastic corrective action to cure the FDA compliance

issues, including recertifying the Abiomed field team and management on the Impella

labels to comply with FDA regulations.  Defendant Minogue admitted:

In the recent months, Abiomed, in coordination with the FDA, has taken
extensive actions to correct our noted compliance issues identified in our
annual report.  Abiomed has conducted an internal compliance audit of
marketing materials and recertified the field team and management on our
Impella labels.

Abiomed was also audited by the FDA at our headquarters this summer,
and there were no observations of quality issues related to our operations.
Our corrective action plan on our compliance issues appears to be moving

69

forward, and Abiomed is committed to a positive working relationship with the FDA.

178.    Abiomed's stock price plunged on the news, falling from a closing price of $19.82 per share on October 31, 2012 to close at $13.61 on November 1, 2012. This $6.21 single day drop represents almost 32%.

179.    Analysts and the financial news focused in on the revelation of the D.C. U.S. Attorney's Office's investigation and the slowed growth for the second half the fiscal year. For example:

- A November 1, 2012 Jeffries Company Note stated that "the focus was squarely on a newly disclosed US Attorney investigation and conservative guidance, which suggests dramatically slower growth in the second half. . . Guidance for U.S. Impella was kept at 30% for the fiscal year. This is despite about 45% for the first two quarters of the year and implies a marked slowdown in the latter two quarters. This slowdown likely incorporates some conservatism, but is also a reflection we believe of the tighter oversight by the company of its marketing practices following an internal audit that was conducted after the company received two FDA letters related to the Impella 2.5 device, first in January 2010 and followed by June 2011." Regarding the DOJ investigation, the report also noted that "it does make some sense that the subpoena is related to the warning letters the company received from the FDA."

- A November 1, 2012 Morgan Stanley report stated, "Given the FDA's prior concerns regarding Impella marketing, our sense is that issues did exist that may have not been addressed quickly enough."

- SBWire reported on November 1, 2012 that "the company plunged this morning on pre-market trades due to them disclosing that on October 26, 2012, it was informed that the U.S. Attorney's Office for the District of Columbia is conducting an investigation focused on its marketing and labeling of the Impella 2.5."

- MidnightTrader.com reported on November 1, 2012:  "In corporate news, ABIOMED (ABMD) is down 30% and has touched a new year low of $13.27, after the company disclosed that the United States Attorney's Office for the District of Columbia is conducting an investigation focusing on the company's marketing and labeling of the Impella 2.5."

- The Wall Street Journal reported on November 2, 2012:  "Abiomed slid 6.21, or 31%, to 13.61, after the biotechnology company said there is a federal investigation into the marketing and labeling of one of its products."

- EPVantage reported on November 2, 2012:  "Abiomed's release of its quarterly earnings yesterday contained both good and bad news, but judging by its stock's performance it was the bad news that resonated. The heart pump specialist has been subpoenaed by the US Attorney s Office in the District of Columbia as part of an investigation into the Impella 2.5 device.  As a result Abiomed's share price tanked by 31% to $13.7.  The subpoena, served on Halloween, appropriately comes under the Health Insurance Portability and Accountability Act, and seeks documents related to the Impella 2.5.  Abiomed said it understands the investigation focuses primarily on marketing and labelling issues, adding that it is responding to the subpoena and intends to cooperate fully.  But with the Impella franchise, and its US sales particularly, providing the vast majority of Abiomed's revenues, any threat to its success is a huge worry for investors."

- The Boston Globe reported on November 2, 2012 that "[s]hares of Abiomed Inc. plunged by nearly one-third on the Nasdaq stock exchange Thursday after the Danvers company said it is the subject of a federal investigation.  In documents filed with the Securities and Exchange Commission, the cardiac device maker disclosed it has received a subpoena from the US attorney's office seeking files related to the labeling and marketing of its Impella 2.5 heart pump."

180.    As anticipated, Abiomed's overall revenue and Impella revenue growth did decline for the quarters immediately following this announcement indicating a loss of revenue once Abiomed was forced to cease its previously undisclosed illicit marketing and promotional activities of the Impella 2.5.  Indeed, on May 2, 2013, Abiomed announced that its Impella revenue growth for the fiscal year 2013 was only 31%, despite the 45% growth in the first half of the year before the FDA and internal audits and the Company's wholesale recall of its illicit marketing materials.

## I.      LOSS CAUSATION

181.     As detailed herein, during the Class Period, the Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the Company's common stock price, and operated as a fraud or deceit on acquirers of the Company's common stock.  At all times relevant, the Defendants' materially false and misleading statements and omissions, alleged herein, directly or proximately caused the damages suffered by the Lead Plaintiffs and other Class members.  Those statements were materially false and misleading because, *inter alia*, they misrepresented and failed to disclose that Abiomed had been engaging in widespread illegal promoting and marketing of the Impella 2.5, misrepresented and failed to disclose Abiomed's communications with the FDA regarding its illegal promotion and marketing of the Impella 2.5, and failed to disclose a true and accurate picture of Abiomed's business, controls and revenues.  Throughout the Class Period, the Defendants publicly issued materially false and misleading statements and omitted material facts, causing Abiomed's common stock price to be artificially inflated.  Lead Plaintiffs and other Class members purchased Abiomed's common stock at those artificially inflated prices.

182.     When the truth about Abiomed's promotion and marketing practices was revealed, the Company's common stock declined, as the prior artificial inflation came out of its common stock price, causing substantial damage to Lead Plaintiffs and the Class. That decline in Abiomed's common stock price was a direct result of the nature and extent of the Defendants' fraud finally being revealed to investors and the market.  The timing and magnitude of the common stock price decline negates any inference that the loss suffered by Lead Plaintiffs and other members of the Class was caused by changed

market conditions, macroeconomic or industry factors or Company-specific facts unrelated to the Defendants' fraudulent conduct.  The economic loss, *i.e.*, damages, suffered by the Lead Plaintiffs and other Class members was a direct result of the Defendants' fraudulent scheme to artificially inflate the Company's common stock price and the subsequent significant decline in the value of the Company's common stock when the Defendants' prior misrepresentations and other fraudulent conduct was revealed.

183.    Defendants' fraudulent conduct, as alleged herein, proximately caused foreseeable losses to Lead Plaintiffs and the other members of the Class.  The Company's stock price climbed from $11.54 to a high of $24.62 during the Class Period.  The truth about Abiomed's promotional and marketing practices was revealed to the market on November 1, 2012.  Before the market opened, Abiomed revealed that the D.C. U.S. Attorney's Office had commenced an investigation into the Company's marketing and promotional practices regarding the Impella 2.5 catheter.  The same day, Defendants revealed that the FDA audited Abiomed and that Abiomed conducted an internal audit in the summer of 2012 which resulted in "extensive actions" to correct compliance issues including "recertify[ying] the field team and management on [] Impella labels." Defendants also announced that Abiomed was keeping guidance for Impella revenue growth for the year at 30% despite 45% growth in through the first half of the year.  On this news, the stock dropped precipitously to $13.61, a one-day drop of almost 32%.  In fact, SBWire reported that Abiomed shares dropped almost 30% in the first 45 minutes of very heavy trading.

184.     Loss causation is further evidenced by the reaction of market analysts and financial news to the disclosures on November 1, 2012, as detailed above in ¶170. Indeed, news and analyst reports published at the time demonstrate that the decline in the Company's securities price following the revelations of the D.C. U.S. Attorney's Office investigation into Abiomed's marketing practices.  For example, Jeffries noted on November 1, 2012 that "the focus was squarely on a newly disclosed US Attorney investigation and conservative guidance, which suggests dramatically slower growth in the second half."  Jeffries tied the reduced revenue guidance for the remainder of the year to these same issues: "This slowdown . . . is . . . a reflection we believe of the tighter oversight by the Company of its marketing practices . . . ."

185.     Abiomed's financial condition and operations, including the Company's fraudulent practices vis-à-vis its illegal off-label marketing program were material information to Lead Plaintiffs and the other members of the Class.  Had the truth been disclosed to the market at or before the end of the Class Period, Lead Plaintiffs and the other Class members would not have purchased Abiomed stock at all, or would have done so only at substantially lower prices than the artificially inflated prices that they actually paid.

## J.     ADDITIONAL SCIENTER ALLEGATIONS

186.     As alleged herein, Defendants acted with scienter with respect to the materially false and misleading statements discussed herein, as they had actual knowledge that the statements were false or misleading or acted with deliberate and reckless disregard for the truth or falsity of those statements.  In addition to the allegations detailed above, Defendants' scienter is established by: (a) their insider

trading; (b) the fact that the misconduct related to Abiomed's core business; and (c) the

pervasiveness of the misconduct.

      1.      **The Insider Trading Supports A Strong Inference Of Scienter**

      187.      By virtue of their knowingly or recklessly disregarding the falsity of the

materially false and misleading statements and omissions alleged herein, there is a strong

inference that the Individual Defendants acted with scienter.  Further, as set forth in the

Form 4 filings for Abiomed directors and officers, the Individual Defendants and other

executives reaped substantial proceeds through the sale of Abiomed's common stock

during the time period that the FDA contacted Abiomed on January 28, 2010 through the

end of the Class Period, further evidencing a strong inference of scienter.   Indeed,

Defendants alone reaped almost $11 million during this period.  Attached as Exhibit A is

a chart evidencing this insider trading.

**Defendant Minogue**

      188.      Specifically, during the time period that the FDA contacted Abiomed on

January 28, 2010 through the Class Period, Defendant Minogue, was in possession of the

material non-public information detailed above regarding the Company's illicit and off-

label marketing and promotion practices as well as the FDA's concern over the

Company's illicit marketing and promotions activities as detailed herein.

Notwithstanding his access to and failure to disclose that information, Defendant

Minogue reaped over $9.5 million dollars through sales of his common stock during this

period.  The magnitude, timing and circumstances of Defendant Minogue's trades are

highly suspicious and further contribute to a strong inference of scienter.

189.    During the time period that the FDA contacted Abiomed on January 28, 2010 through the end of the Class Period, Defendant Minogue sold 586,149 shares of Abiomed's common stock, reaping $9,636,124 in proceeds.  These sales accounted to up to 48% of Defendant Minogue's total holdings of Abiomed's common stock at the time.

190.    Further, Defendant Minogue's trading during this 33-month time period is distinctly different from his trading practices in the 33-months prior.  In that prior period before being contacted by the FDA, Defendant Minogue sold a total of only 27,987 shares of Abiomed's common stock for proceeds $484,650.

191.    Moreover, the timing of Defendant Minogue's sales is highly suspicious. During the timeframe January 2010 through May 2011, when Defendants did not disclose that the FDA was investigating its marketing practices, Defendant Minogue sold 525,491 shares for proceeds of $8,208,551.  Then, from May 2012 through June 2012, the same time period when, unbeknownst to shareholders, the FDA increased its scrutiny of Abiomed's marketing which lead to the FDA auditing the Company's marketing materials and the Company itself was conducting an internal audit and recalling virtually every page of its illicit marketing materials, Defendant Minogue sold another 60,658 shares for proceeds of $1,427,573.

**Defendant Bowen**

192.    Likewise, during the time period that the FDA contacted Abiomed in January, 2010 through the end of the Class Period, Defendant Bowen was in possession of the material non-public information detailed above regarding the FDA's concern over the Company's illicit and off-label marketing and promotion practices as well as the FDA's concern over the Company's illicit marketing and promotions activities.

76

Notwithstanding his access to and failure to disclose that information, Defendant Bowen

nevertheless reaped over one million dollars through sales of his Abiomed common stock

during that period and yet sold no stock prior to the that time from the inception of his

employment in December 2008.  The magnitude, timing and circumstances of Defendant

Bowen's trades are highly suspicious and further contribute to a strong inference of

scienter.

193.    During the time period that the FDA contacted Abiomed on January 28,

2010 through the end of the Class Period, Defendant Bowen sold 57,919 shares of

Abiomed's common stock, reaping $1,302,878 in proceeds.  In addition, most of

Defendant Bowen's trades were made when the Company's stock – which plummeted to

$13.61 after the truth was revealed at the end of the Class Period – was trading between

$20.33 and $24.26 per share, nearly at the Company's Class Period high of $24.62 per

share.

194.    Moreover, his trading pattern during this 33-month period was distinctly

different from his trading practices prior to that period as he made no sales of Abiomed

common stock prior to this period.  Further, the vast majority of Defendant Bowen's sales

were made during the Class Period, most of which were during the last third of the Class

Period just months before the truth was disclosed.

195.    Additionally, the timing of Defendant Bowen's sales is highly suspicious.

The vast majority of Defendant Bowen's sales occurred from May 2012 through August

2012, the same time period that, unbeknownst to shareholders, the FDA increased its

scrutiny of Abiomed's marketing which lead to the FDA auditing the Company's

marketing materials and the Company itself was conducting an internal audit and

recalling virtually every page of its illicit marketing materials.  During that time,

Defendant Bowen sold 54,271 shares for proceeds of $1,240,428.

**<u>Non-Defendant Executives</u>**

196.    Additional senior officers also engaged in substantial insider trading

during the time period that the FDA contacted Abiomed on January 28, 2010 through the

end of the Class Period, collectively reaping more than $5.6 million in proceeds from

their Class Period sales of Abiomed's stock.  In addition to the magnitude of those trades,

the circumstances surrounding them are highly suspicious.

197.    During the time period that the FDA contacted Abiomed on January 28,

2010 through the end of the Class Period, Michael Howley, Abiomed's VP of Global

Sales and Marketing, sold 31,378 shares of Abiomed's common stock, reaping $624,177

in proceeds, with more than half of these being during the Class Period.  Moreover, his

trading pattern during this 33-month period was distinctly different from his trading

practices prior to that period as he made no sales of Abiomed common stock prior to this

period from the inception of his employment in March, 2009.

198.    During the same period, Andrew Greenfield, Abiomed's VP of

Healthcare Solutions, sold 78,172 shares of Abiomed's common stock, reaping

$1,367,996 in proceeds, with more than half of these being during the Class Period.

Moreover, his trading pattern during this 33-month period was distinctly different from

his trading practices in the 33-months prior to that period as he sold only 5,634 shares of

Abiomed's common for proceeds of $73,219.

199.    During this same period, David N. Weber, Abiomed's Chief Operating

Officer, sold 59,167 shares of Abiomed's common stock, reaping $1,209,844 in

proceeds, with the majority of these being during the Class Period.  Moreover, his trading

pattern during this 33-month period was distinctly different from his trading practices in

the 33-months prior to that period as he sold only 4,900 shares of Abiomed's common for

proceeds of $87,269.

200.    Similarly, during the time period, William Bolt, Abiomed's SVP of

Global Product Operations, sold 130,024 shares of Abiomed's common stock, reaping

$2,426,491 in proceeds, with the majority of these being during the Class Period.

Moreover, his trading pattern during this 33-month period was distinctly different from

his trading practices in the 33-months prior to that period as he sold only 24,900 shares of

Abiomed's common for proceeds of $478,869.

### 2. The Misconduct Related To Abiomed's Core Business Which Further Evidences Defendants' Scienter

201.    Abiomed's primary revenue driver is the Impella 2.5 as the vast majority

of its revenue was derived sales of the Impella 2.5 during the Class Period.  Thus, the

promotion and marketing of the Impella 2.5 are of critical importance to its operations.

202.    Facts that are critical to Abiomed's business, operations, financial

reporting and management are presumably known by its executive officers, including the

Individual Defendants.  The Individual Defendants directly participated in the

management of Abiomed, were directly involved in the day-to-day operations of Abiomed

at the highest levels and were privy to confidential proprietary information concerning

Abiomed and its business, operations, marketing and promotion, as alleged herein.

203.    Moreover, Minogue closely oversaw the Company's sales efforts.

Minogue attended all quarterly sales conference calls and both Minogue and Bowen

attended annual sales meetings.  Further, the June 2011 FDA Warning Letter was

addressed to Minogue and he attended the meeting with the FDA on February 24, 2012. Additionally, Minogue himself went on "Mad Money" and improperly marketed the Impella 2.5, including in comparison to the IABP and both Minogue and Bowen made similar improper statements in SEC filings and on conference calls with analysts.

### 3.     The Pervasiveness Of The Misconduct Further Supports A Strong Inference Of Scienter

204.     The pervasiveness of the illicit and off-label marketing and promotion of the Impella 2.5 detailed by numerous CWs – former employees in various geographic locations and business units – further supports a strong inference of scienter.  For example, several CWs described Abiomed's practices of off-label marketing.  The fact that these practices occurred nationwide and were attested to and confirmed by the consistent accounts of numerous former employees supports that these were not isolated instances, but a widespread pattern of fraudulent activity.  Moreover, these practices were the result of training and direction by management.  For example, as reported by several CWs, Abiomed sales representatives were trained to guide doctors to discussions of off-label uses and prompt them to ask questions regarding off-label uses.  Moreover, Defendants engaged in such improper promotion in SEC filings, interviews and on their website.

205.     Additionally, Defendants received no less than four letters from the FDA, beginning even before the Class Period, and had a meeting with the FDA in February 2012 concerning Abiomed's continued pattern of illicit marketing and promotional activities concerning the Impella 2.5.

## VI.   <u>CLASS ALLEGATIONS</u>

206.    Lead Plaintiffs bring this action as a class action pursuant to Federal

Rules of Civil Procedure, rules 23(a) and 23(b)(3) on behalf of a class ("Class") of all

persons who purchased, or otherwise acquired from such a purchaser, Abiomed's

common stock and/or call options, or sold Abiomed put options on the open market

between August 4, 2011 through October 31, 2012, inclusive, and who were damaged

thereby.  Excluded from this Class are: Defendants; the members of the immediate

families of the Defendants; the subsidiaries, affiliates, successors and assigns of

Defendants; any person who was a partner, officer, executive or director of any such

entity at any time from August 4, 2011 through the date of the Complaint; any entity in

which any excluded person has a controlling interest; and the legal representatives, heirs,

successors and assigns of any such excluded person or entity.

207.    The members of the Class are so numerous that joinder of all members is

impracticable.  While the exact number of Class members is unknown to Lead Plaintiffs

at this time and can only be ascertained through appropriate discovery, Plaintiffs believe

there are thousands of members of the Class at a minimum.  As of January 31, 2013,

Abiomed had 38.56 million shares of common stock outstanding.

208.    Common questions of law and fact exist as to all members of the Class

and predominate over any questions solely affecting individual members of the Class.

Among the questions of law and fact common to the Class are:

- Whether the federal securities laws were violated by Defendants' acts and omissions as alleged herein;

- Whether Defendants participated in and pursued the common course of conduct and fraudulent scheme complained of herein;

- Whether the documents, reports, filings, releases, and public statements disseminated to the Class by Defendants during the Class Period misrepresented material facts about the business, performance and financial condition of Abiomed;

- Whether Defendants acted knowingly or with recklessness in misrepresenting material facts;

- Whether the market price of Abiomed's common stock during the Class Period was artificially inflated due to the misrepresentations complained of herein; and

- Whether Lead Plaintiffs and the other members of the Class have sustained damages, and, if so, the appropriate measure thereof.

209. During the Class Period, Abiomed's stock traded on the NASDAQ National Market System, an efficient national market and Lead Plaintiffs will rely, at least in part, on the presumption of reliance established by the fraud-on-the-market doctrine, as detailed below.

210. Lead Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class. Lead Plaintiffs have retained competent counsel experienced in class and securities litigation and intend to prosecute this action vigorously. Lead Plaintiffs are members of the Class and do not have interests antagonistic to, or in conflict with, the other members of the Class.

211. Lead Plaintiffs' claims are typical of the claims of the members of the Class. Lead Plaintiffs and all members of the Class purchased Abiomed's common stock during the Class Period at artificially inflated prices and have sustained damages arising out of the wrongful course of conduct alleged herein.

212. A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Given that the damage suffered by individual Class members may be relatively small, the expense and burden of individual litigation

make it virtually impossible for the Class members to seek individual redress for the

wrongful conduct alleged.  Lead Plaintiffs know of no difficulty that will be encountered

in the management of this litigation that would preclude its maintenance as a class action.

### VII.   APPLICABILITY OF PRESUMPTION OF RELIANCE:<br>FRAUD-ON-THE-MARKET DOCTRINE

213.    Lead Plaintiffs are entitled to a presumption of reliance established by the

"fraud-on-the-market" doctrine because, among other things:

- Defendants made public misrepresentations and/or failed to disclose material facts during the Class Period;

- The omissions and misrepresentations were material;

- Abiomed's common stock traded in an efficient market;

- The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of Abiomed's common stock; and

- Lead Plaintiffs and other members of the Class purchased Abiomed's common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed without knowledge of the misrepresented or omitted facts.

214.    At all relevant times, the market for Abiomed's common stock was

efficient for the following reasons, among others:

- Abiomed met the requirements for listing, was listed, and its stock was actively traded on the NASDAQ, an efficient national market;

- As a regulated issuer, Abiomed filed periodic public reports with the SEC and the NASDAQ; and

- Abiomed regularly communicated with public investors through established market communications mechanisms, including through the regular disseminations of press releases on the major newswire services and through other wide-

ranging public disclosures, including communication with the
financial press and other similar reporting services.

215.     Based upon the foregoing, the market for Abiomed's common stock

promptly digested current information regarding the Company from the publicly

available sources, described herein, and reflected such information in the Company's

stock.  Under such circumstances, all purchasers of Abiomed's common stock on the

open market during the Class Period suffered similar injury due to the fact that the price

of Abiomed's common stock was artificially inflated throughout the Class Period.

216.     As a result of the foregoing, the presumption of reliance established by

the "fraud-on-the-market" doctrine applies in this case.

## VIII.   NO SAFE HARBOR

217.     The statutory safe harbor provided for forward-looking statements under

certain circumstances does not apply to any of the allegedly false statements pleaded in

this Complaint.  The statements alleged to be false and misleading herein all relate to

then-existing facts and conditions.  In addition, to the extent that any of the statements

alleged to be false and misleading may be characterized as "forward-looking," they were

not identified as "forward-looking statements" when made, and there were no meaningful

cautionary statements identifying important factors that could cause actual results to

differ materially from those in the purportedly forward-looking statements.

218.     Alternatively, to the extent that the statutory safe harbor is intended to

apply to any forward-looking statements pleaded herein, Defendants are liable for those

false forward-looking statements because at the time each of those forward-looking

statements was made, Defendants had actual knowledge that the particular forward-

looking statement was false, and/or the forward-looking statement was authorized and/or

approved by an executive officer of Abiomed who knew that the statement was false when made.  In addition, to the extent that any of the statements set forth above were accurate when made, they became inaccurate or misleading because of subsequent events, and Defendants failed to update those statements that later became inaccurate.

## IX.  CLAIMS FOR RELIEF

**COUNT ONE**
**Violation of Section 10(b) of the Exchange Act**
**and Rule 10b-5 Promulgated Thereunder**
**Against all Defendants**

219.    Lead Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs.  This claim is brought pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78(b) and Rule 10b-5, 17 C.F.R. § 240.10b-5, promulgated thereunder, on behalf of all purchasers of Abiomed common stock and/or call options or sellers of Abiomed put options on the open market during the Class Period.

220.    Throughout the Class Period, Defendants disseminated the materially false and misleading statements and/or omissions specified above, which they knew or recklessly disregarded were misleading in that they contained material misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

221.    Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of Abiomed common stock and/or call options and sellers of Abiomed put options during the Class Period.

85

222.     Lead Plaintiffs and the Class have suffered damages in that, in reliance

on the integrity of the market, they paid artificially inflated prices for Abiomed's

securities.  Lead Plaintiffs and the Class would not have the purchased Abiomed common

stock and/or call options or sold Abiomed put options at the prices they paid or sold at, or

at all, if they had been aware that the market prices had been artificially and falsely

inflated by Defendants' false and misleading statements and/or omissions.

223.     As a direct and proximate result of Defendants' wrongful conduct, Lead

Plaintiffs and the other members of the Class suffered damages in connection with their

purchases of Abiomed common stock and/or call options and sales of Abiomed put

options during the Class Period.

**COUNT TWO**
**Violation of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

224.     Lead Plaintiffs repeat and reallege each of the allegations set forth in the

foregoing paragraphs.  This claim is brought pursuant to Section 20(a) of the Exchange

Act on behalf of all purchasers of Abiomed common stock and/or call options and sellers

of Abiomed put options on the open market during the Class Period.

225.     As CEO, President and Chairman of Abiomed, and by virtue of his

holdings of Abiomed's common stock, Defendant Minogue was a controlling person of

Abiomed within the meaning of Section 20(a) of the Exchange Act and exercised his

power and influence to cause Abiomed to engage in the wrongful conduct alleged herein.

226.     Defendant Minogue acted as controlling person of Abiomed within the

meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of his

position as an officer and/or director of Abiomed, and his ownership of Abiomed's stock,

Defendant Minogue had the power and authority to cause Abiomed to engage in the wrongful conduct complained of herein.  At all times relevant hereto, Defendant Minogue was the CEO, President and Chairman of the Company's Board of Directors, actively managed the Company and reported to Abiomed's investors concerning the Company's financial condition.  By reason of such conduct, Defendant Minogue is liable pursuant to Section 20(a) of the Exchange Act.

227.    As CFO, Vice President and Treasurer of Abiomed, and by virtue of his holdings of Abiomed's common stock, Defendant Bowen was a controlling person of Abiomed within the meaning of Section 20(a) of the Exchange Act and exercised his power and influence to cause Abiomed to engage in the wrongful conduct alleged herein.

228.    Defendant Bowen acted as controlling person of Abiomed within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of his position as an officer of Abiomed, and his ownership of Abiomed's stock, Defendant Bowen had the power and authority to cause Abiomed to engage in the wrongful conduct complained of herein.  At all times relevant hereto, Defendant Bowen was Abiomed's Vice President, CFO and Treasurer, actively managed the Company and reported to Abiomed's investors concerning the Company's financial condition.  By reason of such conduct, Defendant Bowen is liable pursuant to Section 20(a) of the Exchange Act.

## X.    PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiffs, on behalf of themselves and the other members

of the Class, pray for judgment as follows:

A.    Declaring this action to be a proper class action maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure and declaring Lead Plaintiffs to be proper Class representatives;

B.    Awarding Lead Plaintiffs and the other members of the Class compensatory damages as a result of the wrongs alleged in the Complaint;

C.    Awarding Lead Plaintiffs and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

D.    Awarding Lead Plaintiffs and the other members of the Class such other and further relief as the Court may deem just and proper.

## XI.    JURY TRIAL DEMANDED

Lead Plaintiffs demand a jury trial of all issues so triable.

Respectfully submitted,

**BERMAN DEVALERIO**

/s/ Patrick T. Egan
Glen DeValerio (BBO# 122010)
Patrick T. Egan (BBO #637477)
Kristin J. Moody (BBO# 661792)
Daryl DeValerio Andrews (BBO #658523)

One Liberty Square
Boston, MA 02109
Telephone: (617) 542-8300
Facsimile: (617) 542-1194
gdevalerio@bermandevalerio.com
pegan@bermandevalerio.com
kmoody@bermandevalerio.com
dandrews@bermandevalerio.com

*Lead Counsel for Lead Plaintiffs*

*the Fire and Police Pension Association*
*of Colorado, the City of Austin Police*
*Retirement System, and the Proposed Class*

Robert D. Klausner
**Klausner, Kaufman, Jensen &Levinson**
10059 Northwest 1st Court
Plantation, FL 33324
Telephone: (954) 916-1202
Facsimile: (954) 916-1232
bob@robertdklausner.com

*Board Counsel for City of Austin*
*Police Retirement System*

### CERTIFICATE OF SERVICE

I, Patrick T. Egan, hereby certify that this document(s) filed through the ECF

system will be sent electronically to the registered participants as identified on the Notice

of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-

registered participants on May 20, 2013.


/s/ *Patrick T. Egan*
            Patrick T. Egan